[No. 8059. Department One. August 11, 1909.]

PHILIP MILLER et al., *Respondents*, v. PETER WHEELER, Junior, *as Administrator etc., et al., Appellants.*[1]

WATERS—IRRIGATION—APPROPRIATION — AUGMENTED FLOW—PERCO-LATION FROM ARTIFICIAL SWAMPS. Waters appropriated from another watershed for irrigation, and discharged upon the owner's land, forming swamps and accumulations which percolate to and artificially augment the waters of another stream, may be impounded and used by the appropriators as their property, before it leaves their lands, as against a prior appropriator on the augmented stream.

SAME—ABANDONMENT—INTENT—EVIDENCE—SUFFICIENCY. In such a case, intent to abandon such surplus waters is not shown by the fact that the surplus was allowed to run into a natural waterway, when it appears that contracts were made with reference to the use of the accumulated waters after the swamps developed, and the water was actually used for eleven years, and made the subject of conveyance.

SAME—ARTIFICIAL FLOW CONVEYED BY NATURAL WATER COURSE. Waters appropriated from another watershed for irrigation may be turned into and conveyed by a natural water course without becoming subject to the use of others, and is not lost to the appropriators by reason of the loss of identity.

[1]Reported in 103 Pac. 641.

SAME — SPRINGS — STATUTES — CONSTRUCTION. Bal. Code, § 4114, providing that a person upon whose lands seepage or spring water first arises shall have the prior right to its use, if capable of being used thereon, has no application to fountain heads of water courses which have been appropriated by others.

SAME—SURPLUS WATERS—PERMISSIVE USE—PRESCRIPTION. A permissive use of the surplus of appropriated waters will not ripen into rights by prescription, or under the statute of limitations, as the use must be adverse.

SAME—RECAPTURE OF WATERS TURNED INTO STREAM—AMOUNT. Where impounded waters were allowed to flow off the owner's land into a water course with intent to recapture it below, no more can be taken out than was allowed to flow in, as against prior appropriation of the flow of the stream, after making due allowance for waste.

SAME—INTERFERENCE WITH TRIBUTARIES. In such a case, in reclaiming the impounded water, the owner cannot cut off any original sources or tributary springs so as to diminish the perennial flow already appropriated.

Appeal from a judgment of the superior court for Chelan county, Steiner, J., entered January 7, 1908, dismissing an action for an injunction respecting waters used for irrigation, after a trial on the merits before the court without a jury. Reversed.

*Reeves & Reeves*, for appellants.

*Higgins, Hall & Halverstadt* and *Thomas & Sorenson*, for respondents.

CHADWICK, J.—In 1874 Philip Miller settled upon a tract of land now in Chelan county, Washington. At the time, a prior settler, whose improvements he bought, had appropriated and diverted about one hundred miner's inches of water, then flowing in the Quil-toc-chin, latterly called the Squillchuck, a small stream flowing out of the mountains across the Wenatchee valley and into the Columbia river. Thereafter, before the intervention of other rights, he dug a larger ditch, and appropriated and put to beneficial use three hundred and twenty miner's inches, measured under six-inch pressure.

In the summer of 1885, Peter Wheeler and Fletcher Byrd settled on what is now known as Wheeler hill, their lands lying above the point of Miller's head gate and distant about a quarter of a mile from the Squillchuck. On the Wheeler land there were two small springs, and on the Byrd land there was a larger spring. These springs were so located that they furnished no water for irrigation for the owners of the land upon which they arose. The Wheeler and Byrd land, or part of it, formed a natural basin culminating in a narrow gulch descending rapidly into the Squillchuck; and in the springtime, as the snow was melting, water flowed from this drainage basin into the gulch and down into the Squillchuck. The testimony is in sharp conflict as to the amount of water flowing from the springs at the time Wheeler and Byrd made settlement, the witnesses for plaintiffs fixing the flow from them at from four or five inches to eight or ten inches in the summer season; while the witnesses for defendants insist that no water whatever, other than the flood waters of spring flowed from the springs into the Squillchuck.

In the year 1887, Wheeler, Byrd and others went above their lands and onto another watershed, and appropriated the waters of Stemilt creek, which they brought over and used for irrigating their lands. From this time the flow of the springs gradually increased, and marshes of considerable extent formed on the lands, an acre or two on both the Wheeler land and the Byrd place. The marshes formed by the excess waters from the Stemilt were like the springs, so situate that neither owner could collect the waters there accumulating and put them to a beneficial use on his own land. About the year 1894, it was agreed between Wheeler and Byrd that Byrd might lay a ditch so as to drain the excess waters on the Wheeler lands and divert the water to his land adjoining for the purpose of irrigation, and that in consideration therefor Wheeler might have the flow of the Byrd spring and seepage from the marsh after it had passed down the gulch, into the Squillchuck, and on past the Miller

head gates, for use on lands owned by him lower down in the valley.

In the year 1901, C. E. Morse bought the land and water right of Fletcher Byrd. That Wheeler and his grantees used water out of the Squillchuck, sold land and conveyed water rights, from 1895 up to 1906, seems not to be denied. In July, 1906, however, the flow at Miller's head gate being less than three hundred and twenty inches, he brought his action to restrain defendants from all acts and uses of the water that tended to decrease his flow below the amount to which he was entitled under his original appropriation. The gist of the complaint is contained in the following excerpt from the pleadings:

"That since about the 1st day of July, 1906, the quantity of water flowing in said stream and coming down to the headgate of said ditch which is located in section twenty-two (22) township twenty-one (21) range twenty (20) E. W. M. and has been so located since the year 1870, has been less than said three hundred and twenty inches since which time the defendants have taken and diverted, and are continuing to take and divert from said stream, above said head gate about twenty inches of water miner's measure under a six inch pressure, and have prevented its returning to said stream, and have wrongfully deprived the plaintiffs thereof, said water so taken and diverted being water arising from springs located upon or near section three (3) township twenty-one (21) range twenty (20) E. W. M. which are and were, at the time plaintiffs' right to take said waters became vested, feeders of said main stream and a part of plaintiff's said water."

There is no evidence whatever tending to show that any diversion of water has been made by any of the appellants from the Squillchuck itself above Miller's head gate. Hence, we conclude that the diversion complained of is the digging of the ditch which drained the marsh and spring on the Wheeler land, with the incidental right claimed by the Wheelers and their grantors to divert the overflow of the Byrd spring and marsh, after it had followed the natural path of

gravitation into the Squillchuck. Confusion may be the worse confounded, however, for appellants say in their brief that respondents are seeking to restrain a diversion *below* the Miller head gate. No findings of fact were made by the trial court, but we think the evidence shows that the greater part of the water now flowing down the gulch into the Squillchuck from Wheeler hill is due to the seepage from the Stemilt waters which have been turned on the lands of appellants. The question naturally occurs whether the water from this artificial source, having naturally gravitated into the soil and percolating therein, may be ditched and drained for further use by the owners as against the right of a lower appropriator; in other words, whether percolating waters arising from an artificial source become a natural flow of an existing watershed and a part of its drainage stream. Our conclusion is that it may be or may not be so, according to the facts presented in the particular case under consideration. The Stemilt waters being the result of the landowners' energy and effort, it would seem but just to say that, so long as he used them or could impound the overflow or waste upon his own land although for use on other land, one asserting a right of appropriation in no way dependent upon the artificial flow, but made without reference to it, should have no cause to complain. The doctrine of appropriation rests upon the theory of ownership, and while cases going to the particular question here presented are not numerous, there are nevertheless some that in principle sustain the premises which we have laid down.

In Farnham on Waters, § 672d, the rule is stated thus:

"When an appropriation is made of the water of a stream, the rights of the appropriator are limited to the natural condition of the stream at the time the appropriation is made, and he has no interest in the improvements subsequently made which increase the supply of water flowing in it. Therefore, if by his own exertions another increases the available supply of water in the stream, he has a right to appropriate

28—54 WASH.

and use it to the extent of the increase. This rule does not apply to mere removal of obstructions or hastening of flow, so that the actual amount of water which passes along the stream is not increased, but only to cases in which a supply of water is added to the stream which would not otherwise have flowed there."

If this be the rule applying to waters of the stream actually appropriated, the conclusion is inevitable that it would apply with greater force to a supply of water brought from an entirely different source and from another watershed. We find the principle underlying the rule quoted in *Burnett v. Whitesides*, 15 Cal. 35, where the rights of the first appropriator were limited to the natural waters of the stream. In *Platte Valley Irr. Co. v. Buckers Irr. etc. Co.*, 25 Colo. 77, 53 Pac. 334, it was held that one who had increased the average continuous flow of a stream by his own energy and expenditure was entitled to such increase, but would not be entitled to the original flow as against the senior appropriator. In *Herriman Irr. Co. v. Butterfield Min. & Mill Co.*, 19 Utah 453, 57 Pac. 537, the court, acknowledging the principle of ownership in waters developed in excess of the natural flow, says:

"We are clearly of the opinion that the defendant company did not acquire a right to any of the water flowing from said tunnels except such as was developed by percolation, and that the plaintiff retains the right to all the water flowing in the natural channel of Butterfield Creek, diminished only to the extent of the increase of the quantity of water which naturally flowed in the channel of Butterfield Creek, before said tunnels were run, and said springs were dried up."

While the waters of Stemilt creek, when discharged upon the Wheeler and Morse lands, and after their use for irrigation, did not become percolating waters in the full sense—for as we understand the term it rests upon the theory of unknown source—the rights to it while still upon the lands of the owners can be sustained by the same reasoning which under the common law gave a landowner a right to impound

for his own use the water percolating through his own soil. To take it was ever held to be *damnum absque injuria* to another, for it was a component part of the soil. This proposition is too well established to require the citation of authority.

Ownership implies responsibility. If our reasoning requires further support, the fact that the appellants, Wheeler and Morse, because of the artificial augmentation of the natural flow of the Squillchuck, would be held liable for all damage done to the lower appropriators from flooding their lands, injuring the banks of the stream, or washing out their improvements, needs only to be mentioned to meet approval. Respondents' rights must be measured by the condition of the stream at the time of Miller's appropriation in 1874. If his appropriation was subsequent to the development of the Stemilt water, an entirely different question would be presented. If the natural flow of the Squillchuck increases, it is his gain; if diminished from natural causes, it is his loss. He has no interest in an increased flow arising from an independent source, unless abandoned by its owner.

Upon the principle that the law of appropriation as applied to the arid regions will not tolerate a waste of water, it has been held that water that is allowed to run to waste after use on the land of the appropriator is abandoned and that lower appropriators are entitled to the surplus. Farnham, Waters, 694; *Power v. Switzer*, 21 Mont. 523, 55 Pac. 32; *Roeder v. Stein*, 23 Nev. 92, 42 Pac. 867; *Barrows v. Fox*, 98 Cal. 63, 32 Pac. 811. But, abandonment like appropriation is a question of intent, and to be determined with reference to the conduct of the parties. The intent to abandon and an actual relinquishment must concur, for courts will not lightly decree an abandonment of a property so valuable as that of water in an irrigated region. Farnham, Waters, 691. In the instant case, when the marshes developed upon the lands of Wheeler and Morse, but at the place where the waters therein could not be used by the respective owners on their own lands, there is evidence showing that Wheeler agreed

that Byrd might drain the surplus on his land in consideration of the use of the surplus flowing from the Byrd land, through the natural waterways, including the Squillchuck, upon his land down in the valley and below respondents' head gate. This contract was in itself a circumstance tending to show that it was not the intention of the parties who had developed a supply of water and carried it over from the Stemilt to abandon its use. But the fact that the water was actually so used for a beneficial purpose for a period of eleven years, and made the subject of conveyance, seems to us conclusive upon this feature of the case. The fact that the surplus is allowed to run into a natural waterway to which rights of appropriation have attached is a circumstance to be considered, but does not shift the burden of proving an abandonment from respondents. *Hall v. Lincoln*, 10 Colo. App. 360, 50 Pac. 1047.

Respondents invoke the general rule that waters draining into and augmenting the natural flow of the stream and its tributaries become a part of the natural flow of the stream, and hence the property of the prior appropriator. This raises the question whether the bed of the tributary gulch and the Squillchuck itself can be used as a ditch to convey the surplus Stemilt waters from Wheeler hill to the Wheeler lands below the Miller head gate. The law of appropriation is the creature of necessity. It is a growth peculiar to conditions unknown to the common law. It has followed custom rather than fixed conditions, and it was held in the earlier case of *Hoffman v. Stone*, 7 Cal. 46, that the immense cost and waste involved in conveying water to its place of use justified the owner in taking advantage of the natural beds and channels of streams when it could be done without injury to the rights of others. In that case the court said:

· "It would be a harsh rule, however, to require those engaged in these enterprises to construct an actual ditch along

the whole route through which the waters were carried, and to refuse them the economy that nature occasionally afforded in the shape of a dry ravine, gulch, or canyon."

This rule was extended in the case of *Butte Canal & Ditch Co. v. Vaughn,* 11 Cal. 143, wherein Mr. Justice Field, who has so ably and clearly differentiated the law of appropriation from the rules of the common law, said:

"It does not necessarily follow that the water introduced by the defendants became subject to the use of the plaintiffs, because its identity was lost by being mingled with the water naturally flowing in the creek. The rights of the parties, after such mingling, are not unlike the rights of the owners of goods of equal value after their mixture—both are entitled to take their given quantity."

This doctrine is affirmed in the following cases: *Parks Canal & Min. Co. v. Hoyt,* 57 Cal. 44; *Creighton v. Kaweah etc. Irr. Co.,* 67 Cal. 221, 7 Pac. 658; *Paige v. Rocky Ford Canal & Irr. Co.,* 83 Cal. 84, 21 Pac. 1102, 23 Pac. 875; *Malad Valley Irr. Co. v. Campbell,* 2 Idaho 411, 18 Pac. 52; *Herriman Irr. Co. v. Butterfield Min. etc. Co.,* 19 Utah 453, 57 Pac. 537; *Platte Valley Irr. Co. v. Buckers Irr. etc. Co.,* 25 Colo. 77, 53 Pac. 334; *Simmons v. Winters,* 21 Ore. 35, 27 Pac. 7; Kinney, Irrigation, § 246.

Appellants also rely upon Bal. Code, § 4114 (P. C. § 5829), which provides that the person upon whose lands the seepage or spring water first rises shall have a prior right to such waters, if capable of being used upon his lands. A review of the authorities will show that a clear distinction is drawn between springs rising or seeping upon lands and from which there is no outlet, and springs which form the fountain heads of living water courses. The court below has found (otherwise its decree could not be sustained) that there was a living flow from these springs. They thus became a part of the Squillchuck waters, and therefore subject to appropriation. This court has said that, if the statute were given any other effect it would be held unconstitutional.

*Nielson v. Sponer*, 46 Wash. 14, 89 Pac. 155, 123 Am. St. 910.

Nor do we think that any right can be predicated by the Wheelers and their grantees to use water on the valley lands by reliance upon the statute of limitations or rights acquired by prescription. Rights in water come from adverse use rather than a permissive use, and so long as there was an excess of water flowing past the Miller head gate, no right could accrue to the users of that surplus. It must not be inferred from what has been said that the rights of appellants are not without some qualifications, as will be seen from a perusal of the authorities cited. Having decided that appellants did not intend to, and did not in fact, abandon the Stemilt water impounded on or flowing off of their lands on Wheeler hill, but that it was allowed to flow with intent to recapture it at a point below, it follows that its identity must be preserved. Identity in this particular is made possible by measurement. They can take no more out than they put in, making due allowance for natural waste and loss by evaporation. *Burnett v. Whitesides, supra; Wilcox v. Hausch,* 64 Cal. 461, 3 Pac. 108.

Another limitation, as will be noted in the authorities, is that in reclaiming their own they cannot cut off nor dry up any of the original sources and springs tributary to the Squillchuck, the waters of which have been appropriated by respondents and the perennial flow of which they are entitled to. The testimony shows that there was a perennial flow of water from the springs on Wheeler hill. The evidence as to the amount of this flow is so conflicting that we cannot definitely fix it. Having decided that there was some flow, that this was increased by the energy and expenditure of appellants, that the increase was not abandoned, the case will be remanded to the lower court to find the amount of the original flow from the springs on Wheeler hill, the amount this flow has been increased by artificial means, and the amount of depreciation from natural waste and evaporation

of the added flow in passing from Wheeler hill to the Miller head gate; and that it then decree that the amount so found be allowed to pass the head gate for use on the lands of Wheeler and his grantees in the valley below. To accomplish this end, the trial court may take such additional testimony as may be necessary.

RUDKIN, C. J., FULLERTON, GOSE, and MORRIS, JJ., concur.