947 P.2d 732 (1997)
133 Wash.2d 769
OKANOGAN WILDERNESS LEAGUE, INC., Appellant,
v.
TOWN OF TWISP and State of Washington, Department of Ecology, Respondents.
No. 63972-8.
Supreme Court of Washington, En Banc.
Argued May 5, 1997.
Decided December 4, 1997.
*734 Rachel Paschal, Michele C. Lechak, Seattle, amicus curiae on behalf of Center for Environmental Law & Policy
Earth Justice Legal Defense Fund, Todd True, John B. Arum, Seattle, for Appellant.
Callaway, Howe & Detro, Scott Detro, Omak, Christine Gregoire, Atty. Gen., Mark Jobson, Philip McDonald, Asst. Atty. Gen., Olympia, for Respondent.
*733 MADSEN, Justice.
The Okanogan Wilderness League (OWL) appeals from a superior court decision affirming the Pollution Control Hearings Board's (Board) change in the diversion point of the Town of Twisp's 1912 water right from a surface diversion point to wells drawing from groundwater. We reverse.

FACTS
In August 1912, Twisp executed a notice of water right with an intent to divert 10 cubic feet per second from the Twisp River. The diversion was for domestic purposes, fire protection, sanitary purposes, agricultural and mechanical use, and for general municipal purposes within Twisp. Twisp constructed diversionary works and water was diverted to the town. In 1927, Twisp sought approval from the Department of Ecology's predecessor, the State Supervisor of Hydraulics, to change the point of diversion. In 1930, a certificate of change was issued, documenting a water right of 10 cubic feet per second from the Twisp River. However, the parties stipulated that based upon the size of pipe used to divert water, the most Twisp ever used was 3.85 cubic feet per second; the town never used the whole instantaneous withdrawal right of 10 cubic feet per second.
Sometime between 1939 and 1948, Twisp stopped diverting surface water from the Twisp River and began to draw water for municipal uses from wells located in the town. It belatedly applied for and received two groundwater certificates with priority dates of 1967 and 1971. The two certificates authorized instantaneous withdrawal of 500 and 1100 gallons per minute, a total of 1600 gallons per minute, equivalent to 3.55 cubic feet per second. These certificates authorized a maximum annual withdrawal of 224 acre feet per year. By the 1990's, Twisp's withdrawals far exceeded the amount of water authorized under the groundwater certificates.
Floods in 1948, or sometime thereafter, destroyed the diversionary works along the Twisp, and the area was riprapped.[1] The *735 record does not show whether Twisp did the riprapping.
In 1993, Twisp applied to the Department of Ecology for a new water right. The Department informed Twisp that any new permit would be subject to limitations to protect minimum instream flows, and that the Department was postponing decisions on new permits. A Department employee discovered the 1930 certificate of change for the 1912 right in Department records. Twisp then applied to the Department to change the point of diversion of the 1912 water right from the surface waters of the Twisp River to two new wells located within the town, to draw from groundwater which would be in hydraulic continuity with the Methow River (into which the Twisp River flows), and to change the specified uses to general municipal purposes. The Department of Ecology investigated the application for a change in diversion point, and concluded that the change in point of diversion should be allowed, with an annual limitation of 610 acre feet per year based on historical use of the 1912 water right and the 1930 change. The Department determined that the 1967 and 1971 groundwater rights would be supplemental to the 1912 water right (supplemental water rights can be used only when the primary right goes unfulfilled) insofar as the annual limitations are concerned (610 acre feet per year under the 1912 right; 224 acre feet per year under the groundwater certificates).[2] The Department further concluded that Twisp was entitled to an instantaneous withdrawal of 10 cubic feet per second for the 1912 water right, and 3.55 cubic feet per second for the 1967 and 1971 rights, i.e., the instantaneous withdrawal rates under the groundwater certificates were additive to the 1912 instantaneous withdrawal rate. There is no explanation of why the annual limitations were determined to be supplemental, but the instantaneous rates additive.
In reaching the 610 acre feet per year figure, the Department found the 1912 right had been used for three purposes: irrigation, power generation, and domestic water supply. The Department found that 350 acre feet per year was used for irrigation, using surveyor's maps from 1924 to determine that 160 acres had been irrigated. The maps were color coded and identified 70 acres of "irrigated" land, and 90 acres of "cleared" land. The Department found that 148 acre feet per year had been used to power a flour mill for 10 hours a day, 180 days a year. Finally, the Department found that the right supplied domestic water to 500 people in the amount of 112 acre feet per year.
In December 1993, the Yakama Indian Nation and OWL filed separate notices of appeal from the findings, conclusions and decision of the Department of Ecology, and their appeals were consolidated. Subsequently, the Yakama Indian Nation voluntarily withdrew its appeal. Following a formal hearing held in July 1994 before the Pollution Control Hearings Board (Board), the Board issued findings of fact, conclusions of law, and an order confirming the Department's decision except that the perfected 1912 right was reduced to an instantaneous rate of 3.85 cubic feet per second based on the parties' stipulation that this is all that Twisp ever withdrew at any time. The annual limitation of 610 acre feet for the 1912 right was reduced to 570 acre feet per year, because the Board found that if all the "cleared" lands shown on the surveyor's maps were irrigated, then there would have been no reason for a separate color coded designation of "irrigated" lands. The Board found that a "reasonable inference may be drawn that 80% of the cleared lands were irrigated" and thus only 310 acre feet was used for irrigation. Clerk's Papers (CP) at 616. Finally, the Board concluded that the 1967 and 1971 groundwater rights were supplemental to the 1912 right, both as to instantaneous rates and annual limitations.
The Board rejected OWL's claim that the 1912 right had been abandoned, concluding that no intent to abandon had been shown. The Board also concluded that Twisp's requested change in diversion would not cause detriment or injury to other water right holders. The Board remanded the matter to the Department of Ecology for issuance of a *736 certificate of change in point of diversion in accord with its decision.
In September 1994, OWL filed a petition for judicial review in Okanogan County Superior Court. Although it served this petition upon an assistant attorney general for the Department of Ecology, the Department of Ecology, legal counsel for the Yakama Indian Nation, the Board, and Twisp's attorney of record, it did not serve the petition on the Town of Twisp.
In March 1996, the Superior Court issued a memorandum opinion affirming the Board's decision, and, in April 1996, entered an order denying the petition for review. OWL then appealed to this court. Twisp moved to dismiss, arguing that OWL failed to serve all the parties of record as required by the Administrative Procedures Act, and therefore the superior court lacked jurisdiction. This motion has been passed to the merits for consideration at the same time as the other issues in the appeal. The Center for Environmental Law and Policy was granted leave to file an amicus curiae brief in support of the appeal.

ANALYSIS
Initially, on September 26, 1996, Respondent Town of Twisp filed a motion in this court to dismiss OWL's appeal on the ground that OWL did not serve Twisp, a party of record, with its petition for review of the Board decision and therefore the Okanogan Superior Court lacked subject matter jurisdiction. Twisp relies upon the recent decision in Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995), where we held that a superior court does not obtain jurisdiction under the Administrative Procedure Act (APA), RCW 34.05, over an appeal from an agency decision where the appealing party serves the petition for review upon an opposing party's attorney of record but not on the opposing party of record. See RCW 34.05.542(2). We expressly limited the application of Union Bay to the APA and declined to consider other statutes and regulations concerning service requirements. Union Bay, 127 Wash.2d at 620, 902 P.2d 1247. Recently, the court reiterated that Union Bay is limited to the APA. Black v. Department of Labor & Indus., 131 Wash.2d 547, 555-56, 933 P.2d 1025 (1997).
Due to a conflict between RCW 34.05.542(2) and former RCW 43.21B.190, we find in this case that service was made pursuant to former RCW 43.21B.190 (amended in relevant part, see Laws of 1995, ch. 382, § 8). Accordingly, Union Bay does not control. Twisp's motion is denied.[3]
Nevertheless, the APA does govern procedures on review of the agency action in this case. Under RCW 34.05.570(3), agency action may be reversed if the agency has erroneously interpreted or applied the law, the agency's order is not supported by substantial evidence, or the order is arbitrary or capricious. In reviewing the Board's decision, this court sits in the same position as the superior court and applies the APA standards directly to the agency record. Jensen v. Department of Ecology, 102 Wash.2d 109, 113, 685 P.2d 1068 (1984). Finally, where water permit decisions are concerned, the Department of Ecology's discretionary decisions should not be set aside "absent a clear showing of abuse." Id. at 113, 685 P.2d 1068; Schuh v. Department of Ecology, 100 Wash.2d 180, 186, 667 P.2d 64 (1983).
RCW 90.03.380 authorizes a change in diversion point, and provides in part:
The right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which the same is used: PROVIDED, HOWEVER, ... The point of diversion of water for beneficial use or the purpose of use may be changed, if such change can be made without detriment or injury to existing rights.
OWL contends that RCW 90.03.380 protects existing rights by requiring that a point of diversion may be made only to the extent *737 the water right has been put to beneficial use. Further, a change in point of diversion may be made only if no harm to other water rights occurs. Together, OWL urges, these requirements mean that a change in point of diversion may be allowed only where water was being put to actual beneficial use prior to the transfer, i.e., the diversion point of water under a water right may not be changed where the right holder has not continuously applied the water to a beneficial use. Here, OWL maintains, Twisp did not use beneficially use the 1912 water right for nearly 50 years, and therefore no change in point of diversion of water under that right may be permitted.
Washington's statute is consistent with the principle of Western water law that the diversion point of a water right put to beneficial use may be granted unless that change causes harm to other water rights. Both upstream and downstream water right holders can object to a change in the point of diversion or the place of use, which could affect natural and return flows and, thus, adversely affect their rights. A. Dan Tarlock, Law of Water Rights and Resources § 5.17[3][a], at 5-92.1 to .3 (1996); see, e.g., Haberman v. Sander, 166 Wash. 453, 7 P.2d 563 (1932); Farmers Highline Canal & Reservoir Co. v. City of Golden, 129 Colo. 575, 272 P.2d 629 (1954). The statute also presumes that a change in point of diversion may be made only where water has been put to a beneficial use. This is also consistent with established water law principles. A transferred right or a change in point of diversion may be granted only to the extent the water right has historically been put to beneficial use. E.g., May v. United States, 756 P.2d 362, 370-71 (Colo.1988); City of Westminster v. Church, 167 Colo. 1, 445 P.2d 52, 57 (1968); Orr v. Arapahoe Water & Sanitation Dist., 753 P.2d 1217, 1224 (Colo.1988); Basin Elec. Power Co-op. v. State Bd. of Control, 578 P.2d 557, 563 (Wyo.1978); see also Tarlock, § 5.17[5], at 5-93. "[B]eneficial use determines the measure of a water right. The owner of a water right is entitled to the amount of water necessary for the purpose to which it has been put, provided that purpose constitutes a beneficial use." Department of Ecology v. Grimes, 121 Wash.2d 459, 468, 852 P.2d 1044 (1993).
Because the diversion point may not be changed where water has not been put to a beneficial use, the Department of Ecology contends that before a change in point of diversion may be approved under RCW 90.03.380, the existence and quantification of the right must be determined, see Schuh, 100 Wash.2d 180, 667 P.2d 64, and the right must not have been extinguished or lost over the years. (Both quantification of the right and whether it has been abandoned are at issue, and they are discussed below.)
Twisp argues, however, that the Department of Ecology has no authority to determine the validity of the underlying right. Twisp relies upon Rettkowski v. Department of Ecology, 122 Wash.2d 219, 228, 858 P.2d 232 (1993) (Rettkowski I). There, the court held that the Department has no authority to pass upon the validity of water rights and issue cease and desist orders to protect water right holders it has determined have priority. The court acknowledged the Department has authority to tentatively determine whether there are existing rights in order to determine whether to issue permits to appropriate water, but said in the event a conflict exists, the Department must deny the permit rather than determine who has the better claim. Id.
Quantification of a water right is required when a change in point of diversion is sought because RCW 90.03.380 authorizes a change in point of diversion only where water "has been applied to a beneficial use...." Further, the statute states that "[i]f it shall appear that ... such change [in point of diversion] may be made without injury or detriment to existing rights, the department shall issue to the applicant a certificate ... granting the right ... for such change of point of diversion...." RCW 90.03.380. (Here, the Board remanded to the Department for issuance of a certificate of change with annual and instantaneous withdrawal limitations specified by the Board.) The statute thus indicates that quantification of the right to the extent the right has been beneficially used is needed before a certificate of change may be issued. If a right has *738 not been beneficially used to its full extent, or if the right has been abandoned, then issuance of a certificate of change, in the amount of the original right, could cause detriment or injury to other rights.
Rettkowski I is not contrary. It suggests by analogy that in order to decide whether to approve a change in point of diversion, the Department must tentatively determine the existence and extent of beneficial use of the water right. See Rettkowski I, 122 Wash.2d at 228, 858 P.2d 232. (Department has authority to tentatively determine the existence of water rights in order to decide whether to grant permits to appropriate water). Also, if the Department concludes that a water right has been abandoned or otherwise lost, then it should deny the change in diversion point. The Department's determination could not, however, be a final determination of the validity of the water right.
However, to the extent that OWL suggests that nonuse of the water right, in and of itself, means that a change in diversion point may not be permitted under RCW 90.03.380 because "revival" of the right will adversely affect other water rights, the argument is incorrect. The statute plainly refers to water beneficially used and to avoidance of harm to other water rights, not merely to nonuse for a period of time. The analysis in Atencio v. Richfield Canal Co., 177 Colo. 22, 492 P.2d 620 (1972), upon which OWL relies, is in accord. There, a senior appropriator made no effort for 50 years to reconstruct a destroyed dam and diversion works which had historically diverted water from the confluence of two rivers, the Conejos and the San Antonio, but instead diverted water from other points along the Conejos making no use of water from the San Antonio. When the senior appropriator rebuilt the dame and diversionary works, the court held the senior appropriator could not use the newly constructed dam and diversion works to draw water from the San Antonio because to do so would be detrimental to appropriators on the San Antonio. The court noted that although in a previous trial court proceeding the trial court had held that the senior appropriator had not abandoned its water right along the Conejos, the trial court also held that the senior appropriator had abandoned the original headgate due to over 50 years of nonuse and the failure to make any attempt during that time to rebuild the dam and diversionary works. Id., 492 P.2d at 622. The trial court also found that San Antonio water had not been used for over 50 years and resumption of its use would be an illegal interference with the water rights of the appropriators on the San Antonio. That judgment had not been appealed, and it was binding on the parties. Id.
The abandonment of the destroyed dam and diversionary works was key to the court's decision, as further shown by its reliance on authority stating that one who appropriates from an abandoned ditch does not succeed to the old water right, but instead stands alone on the merits of its own appropriation. Id. at 623 (citing authority). Thus, contrary to OWL's apparent contention, Atencio does not hold that a long period of nonuse alone prevents a change in point of diversion. Here, whether Twisp's failure to beneficially use the 1912 water right for nearly 50 years precludes a change in diversion point under RCW 90.03.380 depends upon whether that right has been abandoned or otherwise extinguished. Neither the statute nor any authority cited by OWL supports the conclusion that the sole inquiry is whether water has been beneficially used continuously up to the time the change in diversion point is sought.
Under RCW 90.03.380 a change in diversion point may be granted only to the extent the water right has been put to beneficial use, has not been abandoned or otherwise extinguished, and does not cause detriment or injury to other right holders.
OWL maintains that Twisp voluntarily abandoned its 1912 water right long before it applied for a change in point of diversion. This issue is necessarily one of common law abandonment, because a water right for municipal water supply purposes is exempt from statutory forfeiture of water rights through nonuse. RCW 90.14.140.
Abandonment is the intentional relinquishment of a water right. Jensen, 102 Wash.2d at 115, 685 P.2d 1068; Miller v. *739 Wheeler, 54 Wash. 429, 435, 103 P. 641 (1909). Intent is determined with reference to the conduct of the parties. Id. The burden of proof of abandonment is on the party alleging abandonment. Department of Ecology v. Acquavella, 131 Wash.2d 746, 757, 935 P.2d 595 (1997); Miller, 54 Wash. at 436, 103 P. 641; Tarlock, § 5.18[1], at 5-107. Nonuse is not per se abandonment. Tarlock, § 5.18[1], at 5-106. However, the general rule in western water law is that nonuse is evidence of intent to abandon, and long periods of nonuse raise a rebuttable presumption of intent to abandon, thus shifting the burden of proof to the holder of the water right to explain reasons for the nonuse. Id. at 5-107; see City & County of Denver v. Snake River Water Dist., 788 P.2d 772, 776 (Colo.1990) (29 years). In re Clark Fork River Drainage Area, 254 Mont. 11, 833 P.2d 1120, 1123 (1992) (nonuse by city of two water right claims for over 23 years created rebuttable presumption of abandonment though city continued to carry claims as assets on its books during periods of nonuse); State ex rel. Reynolds v. South Springs Co., 80 N.M. 144, 452 P.2d 478 (1969); Moore v. United Elkhorn Mines, 64 Or. 342, 127 P. 964, 967-68 (1912) (nonuse for 10 years raises rebuttable presumption of abandonment). Both OWL and the Department of Ecology argue in accord with this general rule that in this state there should be a rebuttable presumption of intent to abandon from long periods of nonuse.
Twisp argues, however, that in Washington intent to abandon should not be presumed, citing Miller. Miller does not address the matter, although it does state that "courts will not lightly decree an abandonment of a property so valuable as that of water in an irrigated region." Miller, 54 Wash. at 435, 103 P. 641; see also Jensen, 102 Wash.2d at 115, 685 P.2d 1068. However, that principle applies throughout arid western states which have followed the rule that long periods of nonuse raise a rebuttable presumption of intent to abandon. Twisp also cites Thorp v. McBride, 75 Wash. 466, 135 P. 228 (1913). There, the court said that abandonment would not be justified by nonuse alone, and then added that it is also well established that the water must be put to beneficial use. Id. at 469, 135 P. 228. The water right there was intended for irrigation, mining, domestic use, and power, but had not been beneficially used for 10 or 11 years. The court said the evidence disclosed there was in fact no irrigation, mining, domestic or power uses to which the water could be applied, and refused to preserve the use for some speculative future. Again, the case does not expressly address the issue whether a rebuttable presumption is raised by long periods of nonuse. Further, although OWL and the Department contend the case stands for the proposition that the water right holder failed to provide satisfactory reasons for nonuse, and thus inferentially falls within the cases recognizing the rebuttable presumption of intent to abandon, Thorp does not rest on that ground. The evidence of intent the court examined was not evidence offered in an effort to justify nonuse of the water right, but was instead evidence that no beneficial use of the water existed and the holder's intended uses were purely speculative future uses.
The rule that a rebuttable presumption of intent to abandon is raised through long periods of nonuse, and the shifting of the burden of proof to the water right holder to give reasons justifying the nonuse, is consistent with the high priority of putting water to beneficial use. This court has previously given weight to well-established principles of western water law. Department of Ecology v. Bureau of Reclamation, 118 Wash.2d 761, 767-69, 827 P.2d 275 (1992); Grimes, 121 Wash.2d at 475, 852 P.2d 1044. We adopt the general rule that under the common law theory of abandonment of water rights long periods of nonuse raise a rebuttable presumption of intent to abandon a water right.
Here, the Board found that Twisp's failure to use the 1912 water right since at least 1948 raised a presumption of intent to abandon. The Board further found that Twisp's failure to list any other appurtenant water rights when it applied for the groundwater certificates granted in 1967 and 1971 lent support to the presumption. The evidence in the record supports the Board's determination. It shows that Twisp stopped using the surface water under the 1912 right sometime between 1939 and 1948 when the *740 town began using groundwater from wells located within the town. Sometime in or after 1948, the diversionary works were destroyed in floods and subsequently the diversion area was riprapped. Although the evidence does not show who did the riprapping, Twisp did not try to reclaim the diversion point. Finally, as the Board noted in its findings, in 1967 and 1971 when Twisp belatedly sought groundwater certificates for its wells, it did not mention the 1912 water right even though the application forms asked whether there were any other water rights appurtenant to the lands served by the groundwater withdrawals. CP 1042, 1059.[4] While Twisp argues that the testimony of the Town Manager who looked into Town records without finding any which indicated intent to abandon the right shows lack of intent to abandon; OWL correctly points out that the testimony was excluded as inadmissible hearsay. CP 552-53. The Board permitted Twisp to submit documentary evidence from its records after the hearing, id., but no evidence was submitted from after 1939.
The Board then concluded, however, that Twisp's continuous existence and need for a municipal water supply establish the presumption of intent to abandon. Twisp argues that this reasoning is augmented by enactment in 1967 of RCW 90.14.140, which exempts municipal water rights from statutory relinquishment through nonuse. Twisp says the Legislature could not have intended the exception from statutory relinquishment after 1967 but not from abandonment prior to 1967. We disagree. RCW 90.14.140 applies only to statutory relinquishment based on nonuse alone. Although the court in Acquavella, 131 Wash.2d at 757-58, 935 P.2d 595, said in dicta that the statute codifies the common law, common law abandonment and statutory forfeiture are quite different concepts, with proof of common law abandonment requiring proof of intent to abandon while statutory forfeiture does not. See generally Tarlock, §§ 5.18[1] (abandonment), 5.18[2] (statutory forfeiture; no showing of intent to abandon required). Because RCW 90.14.140 does not require proof of intent to abandon, it is not a codification of common law abandonment. Moreover, the statute clearly does not apply to claims of abandonment based upon nonuse before 1967. Acquavella, 131 Wash.2d at 758, 935 P.2d 595.
Other than RCW 90.14.140, Twisp cites no authority for the proposition that a municipality's continuing existence and need for a water supply rebuts a presumption of intent to abandon arising from a long period of nonuse, or otherwise precludes a finding of abandonment. In contrast, OWL argues, and the Department of Ecology agrees, that a municipality may abandon a water right through years of nonuse. See Consolidated Home Supply Ditch & Reservoir Co. v. Berthoud, 896 P.2d 260 (Colo.1995); City & County of Denver v. Snake River Water Dist., 788 P.2d 772; In re Clark Fork Drainage Area, 254 Mont. 11, 833 P.2d 1120. Otherwise, OWL argues, a municipality could hold unused water rights for speculative purposes, a practice disapproved of in Thorp. We agree with this reasoning.
In view of the nonuse of the water right since at least 1948, the Board correctly found a presumption of abandonment in this case. However, it incorrectly relied upon Twisp's continuing existence as a municipality to rebut the presumption. Twisp has offered no other reason explaining its nonuse sufficient to overcome the presumption of intent to abandon.
The Department of Ecology presents a markedly different argument than Twisp's. Ecology maintains the evidence which shows that Twisp never abandoned the 1912 water right is its change in source of water supply to the two wells under the 1967 and 1971 groundwater certificates. The Department maintains that Twisp effectively changed its point of diversion at that time, although it did so without state authorization. The Department points out that the well water was drawn from groundwater in hydraulic *741 continuity with the Methow River aquifer. Thus, in the Department's view, Twisp continuously used the same water right. The Department cites Lengel v. Davis, 141 Colo. 94, 347 P.2d 142 (1959) for the proposition that an unauthorized, unprotested change in point of diversion is not evidence of abandonment but instead is evidence of nonabandonment.
The Department's argument is raised for the first time upon this review. It also is inconsistent with its position before the Board, where its investigator conceded there was a period of nonuse, and its counsel agreed the 1912 water right had not been used for a long time. CP 490-91, 617. Further, Twisp applied for its two groundwater permits as new water rights, not as a change in diversion point, and in fact the applications and approvals expressly state there were no other water rights appurtenant to the town's lands. CP 1032-42, 1044-60. The Board did enter as a conclusion of law, however, that the 1967 and 1971 groundwater rights were intended to be supplemental to the 1912 right. CP 603, 619. The groundwater permits do not state they are supplemental rights, and in light of the express statements when those permits were sought and granted that no other water rights were appurtenant, it is difficult to see how in 1967 and 1971 the groundwater rights could have been intended to be supplemental to the 1912 right. As to Lengel, the unauthorized change in point of diversion there clearly involved the same water right. The same cannot be said of Twisp's change to withdrawing water from the wells. It is more likely that the town illegally began to draw water from a new source without regard to the 1912 right. In any case, the 1967 and 1971 groundwater certificates clearly evidence water rights distinct from the 1912 right. We reject the Department's argument.
We hold that the change in diversion point was erroneously granted. The 1912 right has been abandoned.
OWL seeks an award of attorney fees on this appeal under RCW 90.14.190, which authorizes the superior court to award fees to the appellant if it finds that the appellant was injured by an arbitrary, capricious, or erroneous order of the Department of Ecology. The Department of Ecology maintains that OWL has shown no injury or invasion of any legally protected interest. See Rettkowski v. Department of Ecology, 128 Wash.2d 508, 518, 910 P.2d 462 (1996) (Madsen, J. dissenting) (Rettkowski II). The Department says that no injury occurred because Ecology granted a change in point of diversion to two proposed wells, unlike Rettkowski II, where the appropriators were ordered to cease exercising their rights. We agree. In Rettkowski II the appropriators were forced to stop irrigating and to expend time and effort in quashing cease and desist orders. Id. Here, in contrast, there has been no order or decision having any actual impact on any water rights. We deny OWL's request for attorney fees.
Reversed.
DOLLIVER, SMITH, GUY, JOHNSON, ALEXANDER and SANDERS, JJ., concur.
DURHAM, Chief Justice (concurring).
Our review of this important water rights case might have ended, without a decision on the merits, when Respondents moved to dismiss this appeal due to the failure of the Okanogan Wilderness League (OWL) to properly serve its petition for judicial review on the Town of Twisp (Twisp). We cannot fault Respondents for trying; the plain language of this court's decision in Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995) would require dismissal. Yet the majority dodges Union Bay, holding that, due to an unidentified "conflict" between RCW 34.05.542(2) and former RCW 43.21B.190, Union Bay does not apply.[1]
I see no reason to pay lip service to Union Bay. Union Bay holds that service of process for judicial review under RCW 34.05.542(2) must be made upon the actual party of record *742 and not the party's attorney.[2] Although Union Bay also suggests that a party's technical noncompliance with the service of process statute divests the court of subject matter jurisdiction,[3] this assertion is incorrect and should be rejected.
Union Bay's motion to dismiss was filed in the trial court just one week after the petition for judicial review was improperly served on the parties' attorneys.[4] Because the defect was raised immediately after it occurred, Union Bay does not address whether a party may raise technical noncompliance with service of process for the first time on appeal. Twisp now invokes Union Bay, arguing that because the defect in service goes to subject matter jurisdiction, it may be raised in this court, despite Twisp's failure to raise it before the Superior Court. Rather than distinguishing Union Bay, I would hold that a party's technical noncompliance with the Administrative Procedures Act (APA) service of process statute (RCW 34.05) does not deprive the court of jurisdiction, and thus cannot be raised for the first time on appeal.[5] To the extent that Union Bay suggests otherwise, it should be reversed.
Union Bay mischaracterized and therefore incorrectly applied the doctrine of subject matter jurisdiction. In general, subject matter jurisdiction is an "elementary prerequisite to the exercise of judicial power."[6] Where a court has no subject matter jurisdiction, the proceeding is void.[7] A court's lack of subject matter jurisdiction may be raised by a party or the court at any time in a legal proceeding.[8]
However, the character of subject matter jurisdiction differs in courts of general and limited jurisdiction. A court of general jurisdiction has subject matter jurisdiction where it has the authority to adjudicate the type of controversy or action.[9] If the type of controversy is within the subject matter jurisdiction of a court, then all other defects or errors go to something other than subject matter jurisdiction.[10]
In contrast, the authority of a court of limited jurisdiction is confined by the terms of its authorizing statute. When a statute creates a cause of action that otherwise would not exist, such as an appeal of an administrative decision, the Legislature confers limited jurisdiction on the courts. In that instance, as in Union Bay, the Superior Court is exercising appellate jurisdiction, derived solely from the statute. Because the Legislature confers jurisdiction, it may necessarily condition that grant and a court has no power to assume jurisdiction greater than that conveyed by the statute.[11]
*743 Relying on the rationale that the Legislature may limit or condition a grant of limited jurisdiction, a line of Washington cases has held that compliance with statutory procedures is a condition affecting a grant of appellate jurisdiction to the Superior Court.[12]Union Bay has applied this conception of limited subject matter jurisdiction to encompass incorrect service of process on a party's attorney, rather than the party. This approach is overly formulaic and ill advised. To find its origins, one must follow this line of cases back to the Depression.
"A court of special, limited, or inferior jurisdiction must by its record show all essential or vital jurisdictional facts of its authority to act in the particular case, and in what respect it has jurisdiction. This rule also applies to jurisdiction over special statutory proceedings exercised in derogation of, or not according to, the course of the common law. So the necessary jurisdictional facts must affirmatively appear by averment and proof to bring the case within the jurisdiction of such court."[[13]]
The rule states simply that all jurisdictional requirements must be met to empower a court of limited jurisdiction, but this still leaves open the issue of what is a jurisdictional requirement.
Unfortunately, Union Bay and its predecessors assume that the "necessary jurisdictional facts" refers to compliance with procedural rules.[14] Normally, failure to comply with mandatory procedures may be grounds for dismissal if raised in time. But where procedural requirements are equated with jurisdictional necessities, a party's technical failure to comply with a statutory procedure can be raised at any stage in the proceedings, even after a final judgment has been entered. A party's ability to raise procedural defects at any time could result in abuse and cause a huge waste of judicial resources.
Allowing the issue of subject matter jurisdiction to be raised for the first time on appeal has enormous implications for the parties to a legal proceeding, the trial and appellate courts, and the proper functioning of a judicial system. If a case can be litigated for years in the trial court, briefed, argued, and considered first in an intermediate appellate court and subsequently in a supreme court, and after a decision on the merits by the supreme court the party who initially filed the suit or the supreme court itself can for the first time challenge the subject matter jurisdiction of [the] trial court and have the entire matter dismissed, the waste of private and public resources is enormous. Before this waste should be tolerated, an examination should be made to ascertain whether courts limit the exception [to the general rule against raising issues for the first time on appeal] to those matters that properly fall within the definition of subject matter jurisdiction.[[15]]
Elevating procedural requirements to the level of jurisdictional imperative has little practical value and encourages trivial procedural errors to interfere with the court's ability to do substantive justice. Apparently *744 in recognition of this, we have shown remarkable agility in avoiding Union Bay's unfortunate holding. In Continental Sports Corp. v. Department of Labor & Indus., 128 Wash.2d 594, 910 P.2d 1284 (1996), we distinguished Union Bay, and held that service by private courier substantially complies with RCW 51.48.131 (appeals from assessments for industrial insurance taxes) even though we interpreted the statute to require service by regular United States mail. In Black v. Department of Labor & Indus., 131 Wash.2d 547, 933 P.2d 1025 (1997), we distinguished Union Bay again, holding that service of a notice of appeal on the assistant attorney general representing the Department of Labor and Industries substantially complied with RCW 51.52.110 even though the statute clearly required service on the director of the Department. Today the majority transparently avoids the clear application of Union Bay by citing to an unidentified "conflict" between RCW 34.05.542(2) and former RCW 43.21B.190.[16] Not surprisingly, the majority is unable to identify what this conflict is or how it excuses parties from complying with the service of process requirements of RCW 34.05.542(2) in appeals from final decisions of the Pollution Control Hearings Board.
Not only has this court been unwilling to apply Union Bay in subsequent cases, but also Union Bay's underlying rationale has been rejected in recent cases that narrowly define the term "subject matter jurisdiction" and avoid equating procedural requirements with jurisdictional necessities.[17] These cases strictly construe subject matter jurisdiction and reflect the prudent approach that this court should adopt as the rule. The jurisdiction of a trial court exercising appellate authority should not rest on a party's compliance with procedural technicalities. Where the Legislature confers jurisdiction to the courts, it may limit that grant. However, "if the legislature has shown no indication of its intention to limit jurisdiction, the act in question must be construed as imposing no limitation [on jurisdiction]."[18] Such an indication may be found in the language of the statute or from the purpose of the procedural requirement.
The service of process requirement of RCW 34.05.542(2) states that "[a] petition for judicial review of an order shall be ... served ... on all parties of record within thirty days." (Emphasis added.) Although this requirement is couched in mandatory language, that alone does not make it jurisdictional. Failure to comply with mandatory rules may divest a person of right to relief, but it does not divest the court of the ability to grant relief.[19] When a party appeals to a court of limited jurisdiction, it must necessarily comply with all the rules necessary to perfect its appeal. Technical noncompliance with mandatory procedures may be grounds for dismissal if raised at the proper time. However, the noncompliance does not affect the court's subject matter jurisdiction and thus such a defect cannot be raised for the first time on appeal. To allow a party to wave the banner of subject matter jurisdiction and have a claim dismissed at any time, even after a final resolution, would misconstrue the doctrine of subject matter jurisdiction.
In this case, OWL failed to properly serve the parties of record. Had Twisp raised this procedural flaw earlier, dismissal may have been appropriate. However, Twisp waived its objection to imperfect service of process when it failed to raise the issue in the Superior Court. Because the service of process requirement of RCW 34.05.542(2) does not *745 affect subject matter jurisdiction, it cannot be raised for the first time on appeal. To the extent that Union Bay suggests otherwise, it should be overruled.
TALMADGE, J., concurs.
NOTES
[1] "Riprap" is defined in relevant part as "[i]rregularly broken and random-sized large pieces of quarry rock ... used for ... revetments[,]" with "revetment" defined in relevant part as "a facing on an embankment to prevent erosion." Cyril M. Harris, Dictionary of Architecture and Construction 409, 406 (1975).
[2] The Town of Twisp erroneously states that the Department of Ecology determined the 1912 right would be supplemental to the 1967 and 1971 rights.
[3] In oral argument the Respondents were invited to address this issue. In response to questions, counsel for the Department of Ecology opined that Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995), is inapplicable. Counsel for Twisp did not address its motion.
[4] Okanogan Wilderness League (OWL) also points out that in 1993 when Twisp approached the Department of Ecology it sought to expand its groundwater right, and was unaware it had a 1912 water right. It became aware of the right only when it was discovered in the Department's records. The record supports these statements.
[1] Majority at 736.
[2] Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995).
[3] The Union Bay majority noted that the respondent had argued that the failure to serve the party "deprived the Superior Court of subject matter jurisdiction." Union Bay also states that compliance with RCW 34.05.542(2) is a "necessary condition for appellate jurisdiction." Union Bay, 127 Wash.2d at 617, 902 P.2d 1247. Union Bay quotes City of Seattle v. Public Employment Relations Comm'n, 116 Wash.2d 923, 809 P.2d 1377 (1991), which in turn cites Fay v. Northwest Airlines, Inc., 115 Wash.2d 194, 796 P.2d 412 (1990), for the proposition that compliance with procedural requirements is necessary to invoke the Superior Court's "appellate jurisdiction." Union Bay, 127 Wash.2d at 617-18, 902 P.2d 1247. Finally, Union Bay concludes that the petitioner "did not perfect jurisdiction in the Superior Court." Union Bay, 127 Wash.2d at 621, 902 P.2d 1247.
[4] Union Bay, 127 Wash.2d at 617, 902 P.2d 1247.
[5] RAP 2.5(a)(1).
[6] In re the Adoption of Buehl, 87 Wash.2d 649, 655, 555 P.2d 1334 (1976).
[7] In re the Marriage of Ortiz, 108 Wash.2d 643, 649, 740 P.2d 843 (1987).
[8] Bour v. Johnson, 80 Wash.App. 643, 646-47, 910 P.2d 548 (1996) (citing CR 12(h)(3)).
[9] Marley v. Department of Labor & Indus., 125 Wash.2d 533, 539, 886 P.2d 189 (1994).
[10] Marley, 125 Wash.2d at 539, 886 P.2d 189 (quoting Robert J. Martineau, Subject Matter Jurisdiction as a New Issue on Appeal: Reining in an Unruly Horse, 1988 BYU L.Rev. 1, 28).
[11] See Prince v. Saginaw Logging Co., 197 Wash. 4, 20, 84 P.2d 397 (1938); see also 21 C.J.S. Courts § 12 (1990).
[12] See, e.g., City of Seattle v. Public Employment Relations Comm'n, 116 Wash.2d 923, 809 P.2d 1377 (1991) (service of process on all parties within 30 days necessary for jurisdiction); Fay v. Northwest Airlines, Inc., 115 Wash.2d 194, 796 P.2d 412 (1990) (party must both file and serve notice within 30 days); Wiles v. Department of Labor & Indus., 34 Wash.2d 714, 209 P.2d 462 (1949) (existence of final order is a prerequisite to the Superior Court's jurisdiction); MacVeigh v. Division of Unemployment Compensation, 19 Wash.2d 383, 142 P.2d 900 (1943) (failure to file notice of appeal with the superior court clerk considered jurisdictionally fatal); Nafus v. Department of Labor & Indus., 142 Wash. 48, 251 P. 877, 255 P. 148 (1927) (untimely appeal from a decision of the Department of Labor and Industries divests the court of jurisdiction).
[13] Nafus v. Department of Labor & Indus., 142 Wash. at 51-52, 251 P. 877 (quoting 11 Cyc. 696).
[14] Academic treatises clearly reject this approach: Subject matter jurisdiction "is not dependent on the existence of a good cause of action in [the] plaintiff in a cause pending before the court, or upon the sufficiency of the pleadings, the validity of the demand set forth in the complaint, or [the] plaintiff's right to the relief demanded, the regularity of the proceedings, or the correctness of the decision rendered." 21 C.J.S. Courts § 18 (1990) (footnotes omitted).
[15] Robert J. Martineau, Subject Matter Jurisdiction as a New Issue on Appeal: Reining in an Unruly Horse, 1988 BYU L.Rev. 1, 3.
[16] Majority at 736.
[17] See State v. Moen, 129 Wash.2d 535, 545, 919 P.2d 69 (1996) (rejecting the argument that the trial court's failure to comply with 60-day time limit on the entry of restitution orders deprived the court of subject matter jurisdiction to enter such an order); State v. Werner, 129 Wash.2d 485, 493, 918 P.2d 916 (1996) (rejecting the suggestion that the superior court lacked subject matter jurisdiction over a juvenile offender where the case was improperly captioned as an adult court case); Marley v. Department of Labor & Indus., 125 Wash.2d 533, 541, 886 P.2d 189 (1994) (rejecting the argument that errors in a decision of the Department of Labor and Industries affected the Department's subject matter jurisdiction, thereby rendering its order void).
[18] 21 C.J.S. Courts § 13(b) (1990) (footnotes omitted).
[19] 21 C.J.S. Courts § 16 (1990).