[No. 31856-3-II.   Division Two.   August 9, 2005.]

FRIENDS OF THE COLUMBIA GORGE, INC., *Respondent*, v. THE FOREST PRACTICES APPEALS BOARD ET AL., *Appellants.*

36

*Robert M. McKenna*, Attorney General, and *Neil L. Wise* and *Bruce L. Turcott*, Assistants, and *Ross A. Day* (of *Oregonians in Action*), for appellants.

*Nathan J. Baker* (*Staff Attorney for Friends of the Columbia Gorge, Inc.*) and *Gary K. Kahn* and *Peggy Hennessy* (of *Reeves Kahn & Hennessy*), for respondent.

¶1 HUNT, J. — Roy Ostroski and the Washington State Department of Natural Resources (DNR) appeal the superior court's reversal of the Forest Practices Appeals Board's affirmance of a DNR-approved permit.[1] This DNR permit would have allowed Ostroski to convert forest land within a Special Management Area of the Columbia River Gorge National Scenic Area (CRG-NSA) to a new agricultural use. Ostroski and DNR argue that state forest practice rules require the DNR to review the permit for compliance with only the cultural and natural resource guidelines sections of the Management Plan (MP), not scenic resources guidelines.

¶2 We agree with the Forest Practices Appeals Board and DNR that the applicable forest practice rules do not require DNR to review permits seeking conversion of forest land to new agricultural use for compliance with scenic resource guidelines. Therefore, we affirm the Forest Practices Appeals Board and reverse the superior court.

---

[1] Friends of the Columbia Gorge, Inc., had appealed Ostroski's conversion permit to the superior court, arguing that DNR should have reviewed the permit for compliance with Gorge scenic resources guidelines.

## FACTS

### I. Agricultural Conversion Permit

¶3 Roy Ostroski owns 40 forested acres in Skamania County (County), subject to the Columbia River Gorge National Scenic Area Act (Scenic Act), 16 U.S.C. §§ 544--544p. Thirty acres lie within a regulated Special Management Area (SMA). Forest Practices Appeals Board Record (FPABR) at 11. Ostroski plans to convert a portion of these 30 acres to new agricultural use, including growing hay and raising cattle. To achieve this conversion, he plans to build temporary logging roads and to remove trees.

¶4 As DNR instructed, Ostroski submitted a completed State Environmental Policy Act (SEPA), chapter 43.21C RCW, Checklist to the County Planning Department, and he sought review of his plan's "compliance" with the SMA's forest practices requirements from the United States Forest Service.

¶5 The U.S. Forest Service determined that although the proposed use, namely temporary logging roads and tree removal, was "technically a forest practice," the governing standards and guidelines did "not address conversions" from forest to agricultural use. The U.S. Forest Service concluded, "[C]onsidering that the land will be taken out of forest production," the DNR should review the proposed action only for the "*final* land use," i.e., the new agricultural use. Clerk's Papers (CP) at 256 (emphasis added). Under the rules governing new agricultural uses, this meant that DNR would review Ostroski's permit application for "potential impact to cultural or natural resources"; but DNR would not review for potential impact to scenic or recreational resources, as it would have been required to do had it treated the permit application as a "forest practice," rather than a conversion to a new agricultural use.

¶6 The County issued a modified Mitigated Determination of Non-Significance (MDNS), specifying conditions for

permit approval.[2] The County agreed with the U.S. Forest Service that Ostroski's proposed timber harvest was exempt from review for compliance with scenic and recreational resource guidelines because his ultimate proposed land use was agriculture, not forestry. No one appealed the County's MDNS.

¶7 Ostroski then submitted a forest practices application to the DNR. DNR issued a conditional approval of Ostroski's application, incorporating some of the U.S. Forest Service's and the County's conditions for forest practices permit approval.[3]

## II. APPEALS

### A. Forest Practices Appeals Board

¶8 Friends of the Columbia Gorge, Inc. (Friends), appealed Ostroski's DNR permit to the Washington Forest Practices Appeals Board, arguing that DNR was required to apply all Scenic Management Area restrictions, including

---

[2] These conditions required Ostroski (1) to revegetate with grass all harvested areas within 30 days of harvest; (2) to contain stormwater runoff onsite; (3) to apply the County's Critical Areas Ordinance by establishing buffers along waterways and wetlands; (4) to apply the Scenic Act's setbacks, including a 200-foot buffer along Canyon Creek and a 50-foot buffer along its tributary; (5) to create a buffer around historic features on the property as identified by the U.S. Forest Services' archeologist; (6) to apply Skamania County Code reforestation requirements if conversion from forest land to agricultural use is not accomplished within one year after completing tree removal; (7) to apply for road permits where new roads will be created; and (8) to obtain a Skamania County National Scenic Area Land Use Permit for "land clearing, grading and/or stump removal." CP at 275-77.

[3] Although these conditions are not at issue here, we list them to provide context for the various governmental reviews of the subject land and its uses. These forest practices permit conditions required: (1) a Scenic Act archeologist to flag avoidance buffers for cultural resources; (2) work to stop if any cultural resources were discovered; (3) no clearing, including logging, until the County issues a decision about "the grazing, fencing and new agricultural activities" and there has been review under the Scenic Act for new cultivation; (4) application of the Scenic Act's setbacks, including a 200-foot buffer along Canyon Creek and a 50-foot buffer along its tributary; (5) the clumps of "leave trees" remaining in the pasture to "be of the largest tree size available" [no definition of "leave trees" supplied, although reference made to site plan, which is not part of the record on appeal]; and (6) proposed temporary roads used for the harvest to be "pre-flagged and reviewed" by an ecologist and "ripped and seeded" with species appropriate to pasture management immediately after harvest. CP at 282-83.

those pertaining to scenic resource review, before issuing a permit for forest-to-new-agricultural-use conversion. Agreeing that there were no material facts at issue, the parties filed cross-motions for summary judgment, asking the Forest Practices Appeals Board to interpret applicable DNR permit application requirements as a matter of law.

¶9 DNR argued,

[T]he only SMA forest practices guidelines that applied to Mr. Ostroski's application were those from the Cultural and Natural Resource sections of the Management Plan. DNR determined that the state forest practice rules allowed the conversion [from forest to agricultural use] without compliance with the Scenic Resource guidelines.

Br. of Appellant (DNR) at 10.

¶10 The Forest Practices Appeals Board found that (1) the "legislative intent to allow conversion in the [Scenic] Act and its implementing regulations is clear"; but (2) the Scenic Act is ambiguous about how to effect such a conversion, FPABR at 26; and (3) it (the Forest Practices Appeals Board) should defer to DNR's interpretation of the portion of the Management Plan implementing the Scenic Act as incorporated into state regulations under the state Forest Practices Act of 1974, chapter 76.09 RCW. The Forest Practices Appeals Board granted DNR's and Ostroski's motions for summary judgment and affirmed DNR's issuance of Ostroski's permit.

## B. Superior Court

¶11 Friends appealed the Forest Practices Appeals Board's decision to Thurston County Superior Court. Friends also moved for a temporary restraining order, which the superior court granted. Soon thereafter, Friends moved for an injunction. At a preliminary injunction hearing, the superior court orally reversed the Board's decision. Relying on a rule that determines which law governs in cases of conflict, the court ruled that Ostroski's project "must be reviewed per the Special Management Area forest

practice guidelines, not only for cultural and natural resource impacts, but also for scenic impacts, as well." Report of Proceedings (RP) at 66.

¶12 The superior court agreed with the Forest Practices Appeals Board that the process for conversion from forest to agricultural use was unclear under the MP guidelines. But it ruled that it did not owe special deference to the judgment of the U.S. Forest Service, DNR, or the Forest Practices Appeals Board, because those entities "have yet to develop a series of procedures or precedential decisional law or practices." RP at 67-68. The court converted its previous temporary restraining order into a permanent injunction, and it entered a stipulated final judgment.

¶13 DNR and Ostroski appeal the superior court's reversal of the Forest Practices Appeals Board's affirmance of Ostroski's DNR-approved permit.

## ANALYSIS

¶14 This appeal focuses on the following issues:

¶15 1. Is the portion of the Scenic Act incorporated into state law ambiguous about whether DNR was required to apply all of the MP's SMA forest practice guidelines, including those pertaining to scenic resources, to Ostroski's permit application? Or is Ostroski's proposed conversion of forest land to new agricultural use exempt from scenic resources review?

¶16 2. What level of deference, if any, should this court accord DNR's interpretation of then governing regulations?

¶17 3. Was DNR's approval of Ostroski's permit arbitrary or capricious?[4]

---

[4] We note at the outset that, apparently in response to this dispute, the MP implementing the Scenic Act has been amended to clarify the issues in this appeal. Thus, our decision will likely have limited impact on the process for future conversions.

I. REGULATORY BACKGROUND

## A. Columbia River Gorge National Scenic Area Act

¶18 Congress passed the Scenic Act in 1986, 16 U.S.C. §§ 544-544p, establishing the Columbia River Gorge National Scenic Area in Oregon and Washington. Congress also created a process for regulating land use within this Scenic Area, declaring the following dual purposes:

(1) to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge; and

(2) to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with paragraph (1).

16 U.S.C. § 544a.

¶19 In furtherance of these goals, the Scenic Act authorized Washington and Oregon to enter an interstate compact for incorporating the Scenic Act and creating a bi-state[5] Columbia River Gorge Commission (bi-state Commission) to administer it. 16 U.S.C. § 544a-c.

¶20 The Act divides the Scenic Area into three subcategories: Special Management Areas (SMAs), Urban Areas, and General Management Areas. 16 U.S.C. § 544b. The Scenic Act requires the bi-state Commission (1) to develop land use designations within each subcategory of agriculture, forestry, open space, urban area, and commercial or residential development, 16 U.S.C. § 544d(b); and (2) to integrate these designations into an MP implementing the Scenic Act. 16 U.S.C. § 544d(c). For each land use designation, the Scenic Act creates guidelines that the MP must include. 16 U.S.C. § 544d.

¶21 Additionally, for lands within the SMAs, the Scenic Act requires the United States Secretary of Agriculture

---

[5] *Colbert v. Pac. States Marine Fisheries Comm'n*, 124 Wn. App. 821, 829, 104 P.3d 17 (2004) (Commission is a multistate, not federal, agency).

(USSA) to develop additional guidelines and land use designations. 16 U.S.C. § 544f. These USSA guidelines must ensure that:

> management, utilization, and disposal of timber, and exploration, development, and production of sand, gravel, and crushed rock for the construction, maintenance, or reconstruction of roads used to manage or harvest forest products on non-Federal lands within the special management areas take place without *adversely affecting the scenic, cultural, recreation, and natural resources* of the scenic area.

16 U.S.C. § 544f(f) (emphasis added). The bi-state Commission must "incorporate" the USSA's guidelines and designations, "without change," into the SMA portion of the Management Plan implementing the Scenic Act. 16 U.S.C. § 544d(c)(4). The U.S. Forest Service is responsible for accomplishing this incorporation on the USSA's behalf.[6]

¶22 Most pertinent here, the Scenic Act requires the Management Plan and all land use ordinances adopted under 16 U.S.C. § 544d to include a provision to "protect and enhance forest lands for forest uses and to *allow, but not require, conversion of forest lands to agricultural lands*, recreation development or open spaces." 16 U.S.C. § 544d(d)(2) (emphasis added).

¶23 Accordingly, (1) Washington and Oregon negotiated a Columbia River Gorge Compact, which both state legislatures ratified;[7] and (2) the bi-state Commission adopted an MP for the Scenic Area. *See Skamania County v. Columbia River Gorge Comm'n*, 144 Wn.2d 30, 35-36, 26 P.3d 241 (2001).

---

[6] Although, we find no specific reference to this delegation in the record, both parties appear to acknowledge this delegation as proper, and neither party questions it. Noting *U.S. Forest Service is an agency of the United States Department of Agriculture*, for purposes of this opinion, we accept the fact of this delegation.

[7] Codified in Washington at RCW 43.97.015.

## B. Washington State Forest Law

¶24 The Washington Forest Practices Act requires the state Forest Practices Board to adopt forest practices to further its purposes, including minimum standards, procedures for voluntary development of resource plans, administrative provisions, emergency measures, and other such provisions. DNR implements these forest practices. RCW 76-.09.040(1), .020(7).

¶25 Additionally, following Washington's and Oregon's legislatures' ratification of the MP for the Scenic Act, Washington's Forest Practices Board incorporated into state rules by reference the forest practices guidelines from the portion of the MP for the Scenic Act related to SMA's, with the following caveat:

> The CRGNSA [Gorge Scenic Act] special management area guidelines shall apply to all forest practices within the CRGNSA special management area. Other forest practices rules also apply to these forest practices. To the extent these other rules are inconsistent with the guidelines, *the more restrictive requirement controls.* To the extent there is an incompatibility between the guidelines and another rule, *the guidelines control.*

WAC 222-20-040(5)(b) (emphasis added).

¶26 These "special management area guidelines," to which WAC 222-20-040(5)(b) refers, are "the guidelines and land use designations for forest practices developed pursuant to 16 U.S.C. § 544f contained in the CRGNSA [Scenic Act] management plan developed pursuant to 1[6] U.S.C. § 544d." WAC 222-16-010. As a result, DNR applies forest practices guidelines from the portion of the MP for the Scenic Act relating to SMAs when it administers the permitting process for all forest practices within the Scenic Area, in cooperation with the U.S. Forest Service and the bi-state Commission. WAC 222-20-130; WAC 222-46-015.[8]

---

[8] In 1993, under the Scenic Act, Skamania County adopted a Scenic Management Area land use ordinance consistent with the Gorge Management Plan, which

¶27 The Forest Land section of the bi-state Commission's MP implementing the Scenic Act provides the following process for Washington and Oregon when administering permits:

> Each state forest practice agency should regulate forest practices in the SMA, using the SMA guidelines for protection of the scenic, cultural, recreation, and natural resources, with the [U.S.] Forest Service providing the review for compliance with these guidelines.

FPABR at 146.

¶28 Central to the issue before us is the Forest Land section of the forest practices guidelines. This section was incorporated into state law from that portion of the Management Plan for the Scenic Act relating to SMA's, which further provides that some uses are allowed "without review." FPABR at 148. Pertinently, this includes "[n]ew agricultural and open space uses . . . except where there would be potential impact to *cultural or natural resources*" to be allowed without review. Scenic Act Management Plan, Part II, Chapter II, Forest, SMA Guidelines, "Uses Allowed Outright." FPABR at 148 (emphasis added). This provision expressly omits scenic resources review for new agricultural uses. It is this provision that precipitated the current controversy over whether scenic resources review is required for conversion of forest land to new agricultural use within the Scenic Area generally and on Ostroski's land specifically.

## II. STANDARDS OF REVIEW

### Statutory Construction

¶29 Construction of a statute is a question of law, which we review de novo using the error of law standard. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 627, 869 P.2d 1034 (1994). In construing a

---

the ordinance Commission reviewed and approved. *See Skamania County*, 144 Wn.2d at 36.

statute, we give effect to all its language so that "no portion is rendered meaningless or superfluous." *Muckleshoot Indian Tribe v. Dep't of Ecology*, 112 Wn. App. 712, 720, 50 P.3d 668 (2002), *review denied*, 150 Wn.2d 1016 (2003). We construe statutes as a whole with a view toward the purpose of the act and the context of a specific provision. *Muckleshoot Indian Tribe*, 112 Wn. App. at 720-21 ("A court does not glean the meaning of a particular word from that word alone, but rather from the legislature's intent within the statute as a whole.").

¶30 Statutorily prescribed definitions control wherever they appear. *Meese v. Keene*, 481 U.S. 465, 484, 107 S. Ct. 1862, 95 L. Ed. 2d 415 (1987). Where possible, we harmonize provisions of an act "to ensure proper construction of each provision." *Muckleshoot Indian Tribe*, 112 Wn. App. at 721. Courts should seek to "avoid strained, unlikely, or unrealistic consequences" from a particular interpretation. *Muckleshoot Indian Tribe*, 112 Wn. App. at 721.

¶31 A statute is ambiguous if it is susceptible to more than one reasonable meaning. *State Owned Forests v. Sutherland*, 124 Wn. App. 400, 410, 101 P.3d 880 (2004). Where an agency is charged with the administration and enforcement of an ambiguous statute, we give the agency's interpretation great weight in determining legislative intent. *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000). *See also, Waste Mgmt.*, 123 Wn.2d at 628.

¶32 An agency asserting that its interpretation of an ambiguous statute is entitled to deference must:

> show that it has adopted and applied such interpretation as a matter of agency policy. It need not be by formal adoption equivalent to an agency rule, but it must represent a policy decision by the person or persons responsible.

*Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 815, 828 P.2d 549 (1992).

¶33 Absent ambiguity, however, we do not defer to an agency's expertise in construing a statute. *Sutherland*, 124

Wn. App. at 410. Nor will we defer to an agency determination that conflicts with the statute the agency purports to interpret. *Postema*, 142 Wn.2d at 77. Such is not the case here.

### III. CONVERSION OF LAND USE/DESIGNATION—OPERATIVE LAW AND DEFERENCE[9]

¶34 The parties agree that DNR is not charged with administering the Scenic Act directly. Both parties also agree that the operative law here is the state Forest Practices Act of 1974, chapter 76.09 RCW, which DNR is charged with administering and enforcing. RCW 76.09-.140(1), .240(3); WAC-222-46-015.

¶35 DNR contends (1) the Forest Practices Appeals Board views DNR's duty to implement the state Forest Practices Act (which incorporates only portions of the federal Scenic Act), as distinct from enforcing the federal Scenic Act directly;[10] (2) thus, DNR is the agency charged with administering the state Forest Practices Act; and (3) therefore, we should accord deference to DNR's interpretation of any ambiguous language in the state Forest Practices Act's incorporation of portions of the MP for the Scenic Act, which are, in essence, regulations the State has adopted as prescribed by the state Forest Practices Act.[11]

¶36 As we discuss below, we conclude the state forest practices law supplies the decisional authority here. The state Forest Practices Appeals Board found that DNR is the agency charged with administering the governing law. Therefore, if the Forest Practices Appeals Board is correct, we accord deference to DNR's interpretation, so long as its interpretation is part of its established policy and is not in

---

[9] Although the parties discuss whether the Gorge Scenic Act contemplates both zoning and uses in its authorization of conversion, we do not address this issue in light of our holding that state decisional authority controls.

[10] *See Seeder Trees*, Nos. 95-31 & 95-32, Forest Practices Appeals Board, 1996 WA ENVLEXIS 137 (Final Decision Oct. 10, 1996). http://www.eho.wa.gov/ViewCaseDetails.asp?CaseID=109
(last visited July 27, 2005).

[11] Friends argue that if we use the federal Scenic Act as the decisional authority, then we should not accord deference to DNR's interpretation.

direct conflict with the applicable state forest practices law. *Postema*, 142 Wn.2d at 77; *Cowiche*, 118 Wn.2d at 815.

### A. State Incorporation of the Scenic Act

■ ¶37 The parties disagree about which portions of the Scenic Act have been incorporated into state law. Friends argue that (1) the Forest Practices Appeals Board erred in upholding DNR's application of what Friends characterize as the MP's "agricultural use rule"[12] in permitting new agriculture use of forest land "outright," without prior review of scenic resources; and (2) as an "agricultural" rule, it was not incorporated into state law from the MP implementing the Scenic Act.

¶38 DNR and Ostroski challenge Friends' characterization of this rule, noting that (1) the so-called "agricultural use rule"[13] is in the SMA portion of the Forest Lands section of the MP implementing the Scenic Act, under the heading "SMA Guidelines"; (2) as such, the "agricultural use rule" constitutes an SMA guideline on forest practices; and (3) thus, this "agricultural use rule" was incorporated into state law.

¶39 Friends respond that regardless of where the "agricultural use rule" is located in the Scenic Act, this rule was not incorporated into state law because (1) Washington incorporated only those rules created under 16 U.S.C. § 544f; and (2) 16 U.S.C. § 544f requires the Forest Service guidelines to ensure:

> management, utilization, and disposal of timber . . . on non-Federal lands within the special management areas take place without *adversely affecting the scenic*, cultural, recreation, and natural resources of the scenic area.

---

[12] The "agricultural use rule" refers to the Scenic Act Management Plan, Part II, Chapter II, Forest, SMA Guidelines, "Uses Allowed Outright," which permit new agricultural uses so long as they do not pose a potential impact to cultural or natural resources.

[13] Although Friends refer to the "agricultural use rule," in our view, a more accurate term would be the "forest-agricultural conversion rule."

16 U.S.C. § 544f(f) (emphasis added). Noting that the incorporated MP provision on which DNR relies does not require review of scenic resources, Friends argue that the "agricultural use rule" could not have been created under § 544f and, thus, it does not meet the WAC definition of guidelines incorporated into state law. We disagree.

¶40 Washington incorporated into state law only those MP SMA guidelines pertaining to forest practices that the U.S. Forest Service developed to implement the Scenic Act.[14] WAC 222-20-040(5)(b). If Friends believe the MP itself does not comply with federal Scenic Act mandates, its remedy is to petition for rule making directly under the Administrative Procedure Act, chapter 34.05 RCW, not to challenge the rule indirectly by contesting DNR's application of these provisions, incorporated into state law, as it has done here. *N.W. Ecosystem Alliance v. Wash. Forest Practices Bd.*, 149 Wn.2d 67, 75, 81, 66 P.3d 614 (2003) (holding that environmental groups, arguing that forest practices regulations should be declared invalid on the basis that the regulations either did not meet statutory requirements or violated the Forest Practices Act, were required to petition for rule making as a precondition to obtaining judicial review). Therefore, we need not address or decide whether the MP incorporating the Scenic Act, and later incorporated into state law, is consistent with the Scenic Act.

¶41 Accordingly, we hold that DNR properly assumed this conversion provision to be valid, duly incorporated into state law as an SMA forest practice guideline and applicable to Ostroski's permit application.

## B. Classification of Ostroski's Planned Conversion

██ ¶42 Friends observe that Ostroski's planned conversion of forest land to agricultural use will initially

---

[14] These state-incorporated SMA guidelines comprise "the guidelines and land use designations for forest practices developed pursuant to 16 U.S.C. § 544f contained in the CRGNSA [Scenic Act] management plan developed pursuant to 1[6] U.S.C. § 544d." WAC 222-16-010 ("CRGNSA special management area guidelines").

involve harvesting timber and constructing logging roads. Thus, Friends argue, the Board erred in deciding that Ostroski's permit does not constitute a forest practice, subject to review under incorporated management plan scenic guidelines.

¶43 DNR and Ostroski agree that the initial action he proposed under the conversion permit application qualifies as a forest practice. But they argue (1) the whole permit, including the final use, must be considered when determining which guidelines apply; (2) although the initial action (a forest practice) is subject to compliance with scenic, cultural, natural, and recreational resources guidelines, the end use (new agriculture) is not; (3) the Scenic Act and the Management Plan make no provision for the "dual nature" of a conversion proposal such as Ostroski's; (4) lack of an express provision exempting such agricultural conversion from SMA forest land restrictions is an ambiguity in the governing law; and (5) therefore, DNR had authority to resolve this ambiguity in a manner that it believed best comported with the overall intention of the Scenic Act.

¶44 The State of Washington's definition of "forest practices" includes any proposal to harvest timber or to construct a timber road. RCW 76.09.020(11); WAC-222-16-010. Nonetheless, DNR argues, the state Forest Practices Act, as does the MP implementing the Scenic Act,[15] makes an exception to some review that would otherwise be required[16] where the end use is a new agricultural use. Here, all parties acknowledge that, as a precondition to Ostroski's new agricultural use, he must fell trees and construct a temporary logging road to remove them. This does not mean, however, that these activities constitute forest practices automatically requiring scenic resource review.

---

[15] Scenic Act Management Plan, Part II, Chapter II, Forest, SMA Guidelines, "Uses Allowed Outright."

[16] For example, although forest to agriculture conversion is exempt from scenic resources review, DNR does conduct cultural and natural resources review. Scenic Act Management Plan, Part II, Chapter II, Forest, SMA Guidelines, "Uses Allowed Outright."

¶45 The Scenic Act does not require a single classification for a permit. Because the permit at issue here involves both forest and agricultural activities, we agree with DNR and Ostroski that his permit is for both a forest and an agricultural practice. Thus, Ostroski's permit to convert from forest to agricultural use involves a dual classification. But the Scenic Act does not specify which guidelines apply to such a dual classification permit.

## 1. Dual-classification

¶46 DNR and Ostroski assert that (1) applying all forest practice restrictions to agricultural conversions would result in a "de facto prohibition" on agricultural conversion;[17] (2) because the Scenic Act and the MP allow conversions, DNR can imply an exemption from forest practice restrictions in order to effectuate the Scenic Act's purpose to allow agricultural use of forest land, *without* the scenic resources restrictions imposed on forest land retained for forest use; (3) a literal interpretation requiring compliance with all forest practice guidelines when converting forest land into a

---

[17] For forest practices, the following Scenic guidelines would apply under the Scenic Area Management Plan, Part 1, Chapter 1, Scenic Resources, SMA Guidelines, Forest Practices:

(A) Forest practices shall meet the design guidelines and VQO for the landscape setting designated for the management area.

(B) Not more than 16 percent of each total ownership within a viewshed shall be in created openings at any one time. The view shed boundaries shall be delineated by the Forest Service.

(C) Size, shape, and dispersal of created openings shall maintain the natural patterns in the landscape.

(D) The maximum size of any created opening shall be 15 acres. In the foreground of key viewing areas, the maximum size of created openings shall be 5 acres.

(E) Clearcutting shall not be used as a harvest practice on land designated Federal Forest.

(F) Created openings shall not create a break or opening in the vegetation in the skyline as viewed from a key viewing area.

(G) Created openings shall be dispersed to maintain at least 400 feet of closed canopy between openings. Closed canopy shall be at least 20 feet tall.

http://www.co.multnomah.or.us/dscd/landuse/CRGNSAPlan/Home/NSAMP_Home.html (last visited on July 27, 2005).

new agricultural use would essentially eliminate the MP's authorization for new agricultural uses "without [scenic] review"; and (4) the superior court erred by rejecting the Board's decision upholding DNR's and other relevant agencies' interpretation of the law.

¶47 Friends dispute DNR and Ostroski's forecast of the dire result of applying all forest practices restrictions to conversions of forest land to new agricultural uses. Friends support the superior court's conclusion that such application of forest practices rules would not necessarily have been fatal to Ostroski's permit. Friends argue that (1) if DNR's interpretation prevails, the state version of forest practices rules will contain a loophole unintended by Congress; (2) such loophole would undermine the Scenic Act's purpose to protect area resources; and (3) if applications for agricultural conversion are not classified as "forest practices," applicants could sidestep environmental regulations and clear cut in a SMA simply by applying for new agricultural use and then abandoning that planned use once the permit is granted under a lesser standard of review.[18] These dire results, however, are unlikely to materialize.

¶48 First, the MP has recently been revised to resolve the question of which guidelines apply to a conversion.[19] Second, the County's MDNS for Ostroski's permit specifically provided:

> In the event that the [forest to agricultural] conversion is not completed within one year of the completion of the logging of the property, then the reforestation requirements as set out in Skamania County Code § 22.10.030(C) and § 22.16.030 shall be required after consultation with the U.S. Forest Service and in compliance with Skamania County Code § 22.08.080(C)(2)[j].

[18] Friends assert that, following DNR's grant of Ostroski's permit, the U.S. Forest Service revised the MP to "allow a brand new category of uses in the SMAs called 'clearing trees for new agricultural use' and to include a new set of guidelines for such uses." Br. of Resp't at 38. DNR contests Friends' assertion, as unsupported by the record before us. Friends' attachment of this document as an appendix to their brief, to which DNR objects, does not make it part of the record on appeal. Therefore, RCW 34.05.558 precludes our review of Friends' assertion.

[19] Friends have challenged the Forest Service's revision of the MP.

CP at 277. Thus, an applicant such as Ostroski could not use a conversion application to remove the trees and then abandon the agriculture, leaving cleared land; in that event, the applicant would be required to reforest the land, a deterrent to bad faith conversion applications. Third, the application would not escape review if there were a possible impact to cultural or natural resources.

¶49 Moreover, the MP separately authorizes both conversion of forest lands to agricultural lands (Policy No. 13) and use of forest lands for agricultural purposes (Policy No. 12), implying but not specifying a distinction between the two types of dual uses.[20] FPABR at 147. But the MP provides no clear process for land use conversion between forestry and agricultural uses, and its Policies and Guidelines sections contain seemingly conflicting provisions. In the SMA, for example, Policy No. 3 in the Forest Lands chapter provides: *"All new* developments and land *uses shall protect* natural, *scenic,* cultural, and recreation *resources."* FPABR at 146 (emphasis added). Similarly, SMA Policy No. 7, in the same chapter, requires U.S. Forest Service *review* of site plans for *protection* of *scenic,* cultural, natural and recreational *resources,* excepting such review only for catastrophes.[21] FPABR at 146.

¶50 In contrast, the SMA Forest Land Guidelines make an "outright" *exception* from this scenic resources review for new agricultural uses:

*SMA Guidelines*

Uses Allowed Outright

1. The following uses *shall be allowed without review*:

   A.  New agricultural and open space uses (as allowed for in Part II, Chapter 1: Agricultural Land, and Part II, Chapter 3: Open Space, respectively), *except where there would be potential impact to cultural or natural resources.*

---

[20] Friends argue this distinction is also denoted by different fonts—land designations are denoted by capital letters, and land uses are denoted by lowercase letters. FPABR at 147.

[21] The *only exception to review* of scenic resources in the Policy section is contained in SMA Policy No. 15, for "catastrophic situations." FPABR at 147.

http://www.co.multnomah.or.us/dscd/landuse/CRGNSAPlan/ Home/NSAMP_Home.html (last visited on July 27, 2005). Management Plan for the Columbia River Gorge National Scenic Area (adopted by the Columbia River Gorge Commission, October 15, 1991), chapter 2, Forest Land, SMA Guidelines, page II-38; FPABR at 148 (emphasis added). We note that this section specifically excludes review for new agricultural land uses and then, only to ascertain potential negative impact on cultural or natural resources. In contrast, (1) there is no mention of and no requirement for scenic resources review; and (2) the next section designates uses that *"may* be allowed subject to review for compliance with scenic, cultural, natural, and recreational resources guidelines," which include "Agricultural Land," a "review use[ ] allowed for in Part II, Chapter 1." *Id* (emphasis added).

¶51 The superior court ruled here that the stricter set of rules should control, citing WAC 222-20-040(5)(b), which directs that:

> "The CRGNSA [Scenic Act] special management area guidelines shall apply to *all* forest practices within the CRGNSA special management area. Other forest practices rules also apply to these forest practices. To the extent these other rules are inconsistent with the guidelines, the more restrictive requirement controls. To the extent there is an incompatibility between the guidelines and another rule, the guidelines control."

RP at 67.

¶52 We agree with Ostroski and DNR that the superior court erroneously interpreted this section to mean that where provisions *within* the SMA guidelines conflict, the stricter rule prevails. The WAC section above, on which the trial court relied, does not address the situation where SMA guidelines are in conflict with one another. Instead, this section addresses a conflict between other state laws, or "other forest practice rules," and SMA guidelines.

¶53 In contrast, here no other rule or law is implicated. Here, there is no conflict triggering the prevailing stricter

rule; rather, there is a gap, creating an ambiguity, in the guidelines and rules. We hold, therefore, that WAC 222-20--040(5)(b) does not apply here and does not answer the question about which guidelines apply to a dual classification permit.

## 2. Ambiguity

¶54 Here, the Gorge MP may be reasonably interpreted in more than one way. It could mean that all guidelines apply to all permits involving any forest practice. Or it could mean that the guidelines apply to all permits involving a forest practice *except* for those contemplating conversion from forest land to a new agricultural use. Because DNR is the agency charged with administering this ambiguous statute, we defer to its interpretation.[22]

¶55 We affirm, therefore, DNR's and the Board's ruling that conversion from forest land to agricultural use in the Gorge Scenic Management Area does not require scenic resources review.

### IV. ARBITRARY AND CAPRICIOUS

¶56 Lastly, Friends argue that DNR not only erred as a matter of law, but also acted in an arbitrary and capricious manner when it granted Ostroski's forest-agricultural conversion permit without scenic resources review. Friends

---

[22] We are sensitive to Friends' concern that this interpretation may create an unintended loophole. We note, however, that the County's MDNS for Ostroski's permit specifically provided:

In the event that the [forest to agricultural] conversion is not completed within one year of the completion of the logging of the property, then the reforestation requirements as set out in Skamania County Code § 22.10.030(C) and § 22.16.030 shall be required after consultation with the U.S. Forest Service and in compliance with Skamania County Code § 22.08.080(C)(2)[(j)].

CP at 277. Thus, here, the specter of timber land cleared and then abandoned as an agricultural use is minimized because the County and the Forest Service would make Ostroski replant the trees.

Nonetheless, insofar as Friends purport to highlight a possible defect in the Act, our role is to interpret the law, not to fix legislative language that may have unintended effects.

contend that (1) DNR acted arbitrarily in failing to follow DNR and Forest Service staff members' recommendations to review Ostroski's permit under all criteria, including scenic resources review guidelines; and (2) the Board's statement that in the future, the review process for conversions would be on a case-by-case basis, illustrates that DNR's action was arbitrary and capricious. Friends further assert that the rules either apply or they do not apply and that deciding on a case-by-case approach is the "hallmark" of arbitrariness. Again, we disagree.

## A. Standard of Review

¶57 The Washington Administrative Procedure Act governs judicial review of agency actions. Ch. 34.05 RCW. The party challenging an agency's action bears the burden of demonstrating the decision's invalidity. RCW 34.05-.570(1)(a); *Postema*, 142 Wn.2d at 77. We apply the standards of chapter 34.05 RCW directly to the record before the agency, sitting in the same position as the superior court. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 45, 959 P.2d 1091 (1998).

¶58 We reverse an agency action where the agency has erroneously interpreted or applied the law, the agency's order is not supported by substantial evidence, or the agency's decision is arbitrary and capricious. RCW 34.05.570(3); *Postema*, 142 Wn.2d at 77 (citing *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 776, 947 P.2d 732 (1997)).

¶59 An act is arbitrary or capricious if it is a " 'wilful and unreasonable action, without consideration and regard for facts or circumstances.' " *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 769, 49 P.3d 867 (2002) (quoting *Landmark Dev., Inc. v. City of Roy*, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999)). Where there is " 'room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration.' " *Isla Verde Int'l*

*Holdings, Inc.*, 146 Wn.2d at 769 (quoting *Landmark,* 138 Wn.2d at 573). Such is not the case here.

## B. Agency Action

¶60 Friends have not shown that DNR acted without consideration of relevant facts or circumstances when its approval of Ostroski's permit differed from the action some of its employees proposed. That DNR employees expressed divergent views before DNR made a final decision demonstrates, not arbitrariness, but rather that DNR gave the matter due consideration.

¶61 Moreover, it is not clear from the Forest Practices Appeals Board's comments exactly what it contemplates DNR will be evaluating on a case-by-case basis.[23] There are many conceivable pieces of a permit application that may properly be reviewed on a case-by-case basis. Absent evidence of what these are here, we cannot assume or speculate that DNR acted arbitrarily.

¶62 Friends also argue that (1) DNR did not act according to established agency policy, and (2) therefore, DNR forfeited its right to have its application and interpretation of the law accorded deference. Friends cite the following holding in *Cowiche Canyon Conservancy*:

> If an agency is asserting that its interpretation of an ambiguous statute is entitled to great weight it is incumbent on that agency to show that it has adopted and applied such interpretation as a matter of agency policy. It need not be by formal adoption equivalent to an agency rule, but it must represent a policy decision by the person or persons responsible.

118 Wn.2d at 815.

¶63 Because Friends did not meet their evidentiary burden to prove that DNR acted in an arbitrary and

---

[23] Friends argue that DNR's plan for case-by-case review means it is not acting as a matter of agency policy. But the record here indicates that although no formal rule or guidance was developed by the agencies involved, in each agency, a decision maker explicitly considered the issue and supplied the same policy answer that DNR applied to the conflict at issue.

capricious manner, we affirm the Forest Practices Appeals Board's decision upholding DNR's action.

## V. ATTORNEY FEES

¶64 Both Friends and DNR request attorney fees and costs under RAP 18.1(b). Generally, the party that "substantially prevails" will be awarded costs, unless "the appellate court directs otherwise." RAP 14.2. The appropriate amount of the award is determined by statute. RAP 14.3. Because DNR is the prevailing party, we award it fees and costs on appeal.

¶65 Accordingly, we reverse the superior court's reversal of the Forest Practices Appeals Board and thereby reinstate DNR's issuance of a permit to Ostroski to convert his forest land to the proposed agricultural use as conditioned.

ARMSTRONG and VAN DEREN, JJ., concur.