[No. 36489-1-II.   Division Two.   June 17, 2008.]

ODYSSEY HEALTHCARE OPERATING B, LP ET AL., *Appellants*, v. THE DEPARTMENT OF HEALTH, *Respondent*.

*Kathleen Dell Benedict* (of *Benedict Garratt Pond & Pierce*), for appellants.

*Robert M. McKenna, Attorney General*, and *Richard A. McCartan, Assistant*; and *Bruce W. Megard, Jr.* (of *Bennett Bigelow & Leedom, PS*), for respondent.

¶1 Hunt, J. — Odyssey Healthcare, Inc. (Odyssey Healthcare Operation B, LP's parent company), appeals the superior court's denial of its petition for review from the Department of Health's (Department) administrative decision denying Odyssey's certificate of need applications to establish new, for-profit hospice care agencies in King, Pierce, and Snohomish Counties. Odyssey argues that the Department misinterpreted its own rule in forecasting future need for additional hospice care agencies. Holding that the record supports the Department's interpretation of its rule and its resulting determination that existing hospice care agencies can meet the foreseeable future need, we affirm.

## FACTS

### I. Certificate of Need Applications

¶2 Odyssey Healthcare, Inc., is a for-profit hospice care agency that applied for certificates of need (CONs) in King, Pierce, and Snohomish Counties. The Department held public hearings on all three applications. Many members of the public who submitted comments expressed concern that an out-of-state, for-profit hospice care agency such as Odyssey would displace existing locally-operated, nonprofit hospice care agencies. An overwhelming majority of participants opposed Odyssey's applications.

¶3 Many nonprofit hospice care agencies commented that existing providers not only were currently meeting the need for hospice care in King, Pierce, and Snohomish Counties, but also could handle additional patients. For example, the vice president of a Redmond nursing and assisted living care facility wrote,

I cannot believe that . . . new programs are needed or justified. In my setting, current hospice programs are exceeding our needs.

Administrative Record (AR) at 2968. An attending physician at the University of Washington in Seattle stated that he "do(es) not see how bringing in more agencies can do anything but put at risk an already extremely effective system." AR at 2978. A doctor in Tacoma did "not think [the existing hospice care agencies] are overburdened nor [were] their services less than outstanding." AR at 2964. And a hospital in Olympia reported that

[it] has not experienced any capacity problems in requesting hospice services for [its] patients . . . . The quality and availability of hospice services at this time is excellent.

AR at 2985. Similarly, an existing hospice care agency serving Pierce County noted that it "has the ability to expand, and with our present staffing we could easily admit 50 more patients." AR at 3022.

¶4 The Department had previously adopted a six-step methodology for forecasting hospice care need in a particular area: WAC 246-310-290(7). Using survey data to determine statewide usage rates in step one of the methodology, the Department determined whether there was an unmet need for hospice care agencies in King, Pierce, and Snohomish Counties. The Department interpreted step two's direction—to calculate the "average number of total resident deaths over the last three years for each planning area"—as meaning the average number of deaths for each of the four categories listed in step one.[1] WAC 246-310--290(7)(a)(i)-(iv). Using this interpretation, the Department concluded that (1) existing hospice care agencies met the current need in King, Pierce, and Snohomish Counties and (2) there was no justification for more hospice care agencies in those three counties. Accordingly, the Department denied all three of Odyssey's applications.

---

[1] Odyssey's CON applications gave the Department its first opportunity to use the WAC 246-310-290(7) methodology.

¶5 Odyssey requested reconsideration of its three CON applications and moved to consolidate. The Department consolidated the three CON applications, held a reconsideration hearing, and again denied the applications.

## II. Health Law Judge Adjudication

¶6 Odyssey requested adjudicative proceedings. Franciscan Health System, Providence Hospice and Home Care of Snohomish County, and Evergreen Hospice (Intervenors) moved to intervene as interested and affected respondents. The health law judge (HLJ) granted the Intervenors' petitions.

¶7 Odyssey argued that the Department had misinterpreted its own methodology and had improperly forecast the three counties' hospice needs. Specifically, Odyssey asserted that (1) the Department should have interpreted step two of the methodology literally, as "the average number of total resident deaths"; (2) instead, the Department had calculated four different averages based on the four patient categories listed in step one,[2] WAC 240-310--290(7); and (3) the Department had improperly used survey data that had not been available when Odyssey had submitted its CON applications.

¶8 Conceding that there was no issue of material fact, both Odyssey and the Department moved for summary judgment. The Intervenors joined Odyssey's motion for summary judgment. The parties' dispute focused on the proper interpretation of the WAC 246-310-290(7) methodology.

¶9 The HLJ ruled in favor of the Department. Rejecting Odyssey's interpretation of the WAC methodology, the HLJ found that a literal reading of step two would lead to "a strained, illogical result that does not harmonize with all the provisions in the rule." AR at 5055. The HLJ determined that (1) the methodology's ambiguity required defer-

---

[2] See the text of WAC 246-310-290(7)'s six-step methodology, *infra*, at 138-40.

ence to the Department's interpretation; (2) the Department's reading of step two in the context of step one is "logical[ly] . . . harmonious with the other provisions," AR at 5055; and (3) the Department's use of the survey data did not violate the rule because the methodology expressly stated that the Department could use "other available data sources" without reference to the data's availability when the applicant filed its petition. The HLJ granted the Department's motion for summary judgment; it denied Odyssey's summary judgment motion.

### III. Petition for Review by Superior Court

¶10 Odyssey petitioned the superior court for judicial review of the HLJ's decisions. Odyssey asserted that the HLJ had erred by (1) granting the Department's motion for summary judgment and (2) denying Odyssey's motion for summary judgment. More specifically, Odyssey argued that the HLJ had misinterpreted step two of the Department's methodology in WAC 246-310-290(7).

¶11 The Department and the Intervenors opposed Odyssey's petition. They asserted that the HLJ had correctly concluded the Department's interpretation of step two was reasonable and consistent with the rules of statutory construction. The superior court ruled that the HLJ had

> correctly interpreted the "methodology" in WAC 246-310-290, and found no "need" under the methodology for Odyssey's proposed hospice agencies in Pierce, King and Snohomish counties; and
>
> (3) The Health Law Judge therefore was correct in denying Odyssey's three Certificate of Need applications.

Clerk's Papers (CP) at 226. The superior court denied Odyssey's petition for judicial review.

¶12 Odyssey appeals the superior court's denial of its petition.

## ANALYSIS

¶13 Odyssey argues that (1) we should not defer to the Department's interpretation of WAC 246-310-290(7) because its methodology is unambiguous and (2) the Department's interpretation of step two produces an absurd result. We disagree.

### I. CERTIFICATE OF NEED APPLICATIONS

### A. Background

¶14 As part of the state's planning process to control healthcare costs, the Washington State Legislature requires a CON before a "new health care facility" may be built. RCW 70.38.105(4)(a), .015(1); WAC 246-310-020. Because hospice care agencies providing at-home, end-of-life care are "health care facilities," they must apply for a CON to serve a particular county. RCW 70.38.025(6).

¶15 The legislature delegated rule making authority to the Department to establish and to administer the CON program as part of the "goals and principles of the statewide health resources strategy." RCW 70.38.015(1); RCW 43.70.040. Under this authority, the Department requires a CON applicant to show, among other factors, that "[t]he population served or to be served has need for the project[,] and other services and facilities of the type . . . are not or will not be sufficiently available or accessible to meet that need." WAC 246-310-210(1).

¶16 The Department adopted the following six-step methodology for forecasting the need for hospice care in a particular area:

(a) Step 1.[3] Calculate the following four statewide predicted hospice use rates using CMS [Centers for Medicare and Med-

---

[3] Step one of the WAC 246-310-290(7) methodology requires the applicant to calculate "four [categories of] statewide predicted hospice use rates using CMS [Centers for Medicare and Medicaid Services] and department of health data or other available data sources." WAC 246-310-290(7)(a). But because of new Health

icaid Services] and department of health data or other available data sources.

(i) The predicted percentage of cancer patients sixty-five and over who will use hospice services. This percentage is calculated by dividing the average number of hospice admissions over the last three years for patients the age of sixty-five and over with cancer by the average number of past three years statewide total deaths sixty-five and over from cancer.

(ii) The predicted percentage of cancer patients under sixty-five who will use hospice services. This percentage is calculated by dividing the average number of hospice admissions over the last three years for patients under the age of sixty-five with cancer by the current statewide total of deaths under sixty-five with cancer.

(iii) The predicted percentage of noncancer patients sixty-five and over who will use hospice services. This percentage is calculated by dividing the average number of hospice admissions over the last three years for patients age sixty-five and over with diagnoses other than cancer by the current statewide total of deaths over sixty-five with diagnoses other than cancer.

(iv) The predicted percentage of noncancer patients under sixty-five who will use hospice services. This percentage is calculated by dividing the average number of hospice admissions over the last three years for patients under the age of sixty-five with diagnoses other than cancer by the current statewide total of deaths under sixty-five with diagnoses other than cancer.

(b) Step 2. Calculate the average number of total resident deaths over the last three years for each planning area.[4]

(c) Step 3. Multiply each hospice use rate determined in Step 1 by the planning areas average total resident deaths determined in Step 2.

(d) Step 4. Add the four subtotals derived in Step 3 to project the potential volume of hospice services in each planning area.

Insurance Portability and Accountability Act of 1996 regulations, CMS data was unavailable at the time of Odyssey's applications; thus, the Department conducted its own survey to compile data for determining statewide usage rates. When nine small-populated counties failed to return their surveys, the Department used historical data for these counties, where available.

[4] All parties to this appeal appear to agree that each county is a "planning area" for purposes of WAC 246-310-290(7).

(e) Step 5. Inflate the potential volume of hospice service by the one-year estimated population growth (using OFM [Office of Financial Management] data).

(f) Step 6. Subtract the current hospice capacity in each planning area from the above projected volume of hospice services to determine unmet need.

(g) Determine the number of hospice agencies in the proposed planning area which could support the unmet need with an ADC [average daily census] of thirty-five.

WAC 246-310-290(7).

¶17 If requested, the Department may conduct a public hearing on a CON application. RCW 70.38.115(9). After reviewing the hospice care agency's application and any public comments, the Department approves or denies the proposal. WAC 246-310-490. If the Department denies the application, the hospice care agency may request an adjudication before the Department's HLJ. RCW 70.38.115. The Washington Administrative Procedure Act sets forth a procedure for an aggrieved party to seek judicial review of an agency's final decision. RCW 34.05.570.

## B. Standard of Review

¶18 We review de novo a trial court's interpretation of statutes and court rules as questions of law. *Nevers v. Fireside, Inc.*, 133 Wn.2d 804, 809, 947 P.2d 721 (1997) (citing *Westberg v. All-Purpose Structures, Inc.*, 86 Wn. App 405, 409, 936 P.2d 1175 (1997)). An "appellate court stands in the same position as the superior court" when reviewing an administrative decision. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

¶19 The Washington Administrative Procedure Act allows a reviewing court to grant relief from an agency action where the court "determines that . . . (d) The agency has erroneously interpreted or applied the law; [or] (i) The order is arbitrary or capricious." RCW 34.05.570(3). A court may also grant review where an agency "has engaged in unlaw-

ful procedure or decision-making process, or has failed to follow a prescribed procedure" under RCW 34.05.570(3)(c).

## II. STATUTORY INTERPRETATION

¶20 Odyssey argues that the Department's methodology is unambiguous and that the Department erred in failing to interpret literally WAC 246-310-290(7)'s six-step methodology. More specifically, Odyssey argues that the six-step methodology is a mathematical formula that the Department must follow as written.

¶21 The Department and the Intervenors respond that (1) the WAC methodology is complex and ambiguous when read as a whole; (2) thus, we must defer to the Department's interpretation; (3) the Department's interpretation and application of the WAC methodology reached the correct result, namely that King, Pierce, and Snohomish Counties did not need additional hospice care agencies; and (4) Odyssey's proposed interpretation of the rule would lead to an absurd result.

¶22 Agreeing with the Department and the Intervenors, we defer to the Department's interpretation of the WAC 246-310-290(7) six-step methodology.

### A. Rules

¶23 The rules of statutory construction " 'apply equally to administrative rules and regulations.' " *Children's Hosp. & Med. Ctr. v. Dep't of Health*, 95 Wn. App. 858, 864, 975 P.2d 567 (1999) (quoting *State v. McGinty*, 80 Wn. App. 157, 160, 906 P.2d 1006 (1995)), *review denied*, 139 Wn.2d 1021 (2000). Where statutory language is plain and unambiguous, courts derive the statute's meaning from the wording of the statute itself. *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991). But we must also examine the context of the "statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found."

*Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10, 43 P.3d 4 (2002).

## B. Deference to Agency Interpretation

▮▮ ¶24 Where the legislature charges an agency with the administration and enforcement of a statute, we give the agency's interpretation of the statute, as well as the agency's own rule, "great weight in determining legislative intent." *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994) (citing *City of Pasco v. Pub. Employment Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992)). Courts must interpret statutes to harmonize and to give effect to "all provisions . . . whenever possible." *Emwright v. King County*, 96 Wn.2d 538, 543, 637 P.2d 656 (1981).

### 1. Ambiguity

▮▮ ¶25 Odyssey first argues that we should read each of WAC 246-310-290(7)'s six steps for its plain meaning.[5] The Department and the Intervenors counter that we should read the language in step two in the context of the directions in step one. The Department and the Intervenors are correct. To ascertain its meaning, "a term in a regulation should not be read in isolation but rather within the context of the regulatory and statutory scheme as a whole." *City of Seattle v. Allison*, 148 Wn.2d 75, 81-82, 59 P.3d 85 (2002) (interpreting a section in an administrative rule

---

[5] Odyssey further argues that "[w]hen an agency has chosen to adopt a mathematical formula into rule [sic], there is even less basis to 'interpret' the rule." Br. of Appellant at 35. Odyssey relies on *Shearson Lehman Bros. v. Hedrich*, 266 Ill. App. 3d 24, 639 N.E.2d 228, 203 Ill. Dec. 189 (1994), in which the court found that an arbitrator had erred by failing to award wrongfully discharged employees the statutory 11 percent interest on their deferred compensation agreements. 266 Ill. App. 3d. at 29. But *Shearson Lehman Bros.* has little applicability because the "formula" in *Shearson Lehman Bros.* contained only one calculation with an exact percentage, which the arbitrator failed to incorporate. 266 Ill. App. 3d at 29. Here, in contrast, step two is one of many calculations included in the WAC methodology, where each step contains a different variable, and we must read the formula as a whole.

listing the rationales for breath-testing rules) (citing *ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801 807, 863 P.2d 64 (1993)).

¶26 Here, Odyssey and the Department's interpretations are both reasonable readings of step two on its face. But it is unclear whether step one's four categories of "use rates" become four separate averages in step two or one number representing the average of all deaths. WAC 246--310-290(7). Because step two is not severable from the rest of the rule, we read it within the context of the regulatory and statutory scheme as a whole. *See Campbell & Gwinn, LLC*, 146 Wn.2d at 10.

¶27 When read in the context of the entire WAC methodology, step two's application is ambiguous. Despite the simple language used to describe the mathematic methodology in WAC 246-310-290(7), there is ample room for disagreement about various interpretations of the formula used to calculate the unmet hospice care "need" for each county. The WAC 246-310-290(7) methodology in its entirety is a complex formula, not a simple numerical computation. Therefore, we defer to the Department's expertise and interpretation.

### 2. Absurd results

¶28 Odyssey next argues that we should interpret step two to mean that the Department must calculate the sum total of average deaths in each county instead of calculating the total average deaths in each of the four categories in step one, as the Department did here. The Department and the Intervenors counter that Odyssey's interpretation is illogical and would lead to strained results.

¶29 We must avoid interpretations that are unlikely or absurd. *Alderwood Water Dist. v. Pope & Talbot, Inc.*, 62 Wn.2d 319, 321, 382 P.2d 639 (1963). A reviewing court should construe agency rules in " 'a rational, sensible' " manner, giving meaning to the underlying policy and intent. *Mader v. Health Care Auth.*, 149 Wn.2d 458, 472, 70

P.3d 931 (2003) (quoting *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 57, 50 P.3d 627 (2002)).

¶30 The purpose of the WAC 246-310-290(7) methodology is to ensure that a new hospice care agency's application is approved only if a county for which the new facility is proposed has an unmet need for hospice care agencies. WAC 246-310-290(7)(g). Therefore, an application proposing a hospice care agency must show determinations of need, financial feasibility, and cost containment. WAC 246-310-210, -220, -240.

¶31 Odyssey's proposed interpretation of the methodology would require the Department to calculate "average total deaths" in step two, disregarding the four categories listed in step one. Practically, under this calculation, the Department would count each death four different times, thus vastly overestimating the hospice need in each county. For example, King, Pierce, and Snohomish Counties' existing hospice care agencies meet those counties' need for hospice care under the Department's calculation.

¶32 In contrast, Odyssey's interpretation of the methodology concludes that (1) King County needs 52.5 new agencies, (2) Pierce County needs 22.5 new agencies, and (3) Snohomish County needs 16.8 new agencies. Odyssey's results appear strained because the overwhelming majority of public comments submitted in response to Odyssey's CON applications stated that the existing hospice care agencies in King, Pierce, and Snohomish Counties meet current need more than adequately.

¶33 Furthermore, Odyssey's interpretation would frustrate the purpose of the rule—to calculate unmet need for hospice care agencies in each county. WAC 246-310-290(7)(g). Because " '[t]he spirit or purpose of an enactment should prevail,' " we reject Odyssey's interpretation of WAC 246-310-290(7). *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003) (quoting *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981)). Instead, we defer to the Department's interpretation, which is a reasonable

reading of an ambiguous methodology[6] and takes into account the context and purpose of the rule at issue.

### 3. Arbitrary and capricious

¶34 Odyssey also asserts that the Department acted in an arbitrary and capricious manner because it (1) calculated its methodology using incomplete survey data and (2) gathered the survey data after Odyssey filed its CON applications. But WAC 246-310-290(7)(a) provides that the Department may use "CMS and department of health data or other available data sources" to calculate the statewide hospice usage rate in step one of the methodology. And the HLJ found that nothing in the rule prevented the Department from collecting data after an applicant files a proposal.

¶35 On the contrary, the HLJ determined that, in reviewing Odyssey's CON applications, the Department had acted in an appropriate manner by using the surveys to supplement otherwise insufficient data. The HLJ concluded that because CMS data was not available, the Department "reasonably relied on the survey results." CP at 150. Odyssey fails to show that the Department's decision to use surveys to generate such data was willful or unreasoned.

¶36 Odyssey also argues that the Department acted in an arbitrary and capricious manner when it used incomplete survey data to calculate the statewide hospice usage rate in step one of the methodology. The Department and the Intervenors argue that although some low-populated counties did not return their surveys, the absence of this

---

[6] Odyssey's contention that the WAC 246-310-290(7) methodology contains significant flaws is not without merit. But because the methodology is ambiguous, we must defer to the interpretation of the Department as the agency responsible for the methodology's administration and enforcement. *Friends of Columbia Gorge, Inc. v. Forest Practices Appeals Bd.*, 129 Wn. App. 35, 47, 118 P.3d 354 (2005) (citing *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000)). The judicial appeal process is not the appropriate venue for addressing Odyssey's arguments about the inherent defects in WAC 246-310--290(7)'s methodology. Instead, Odyssey should raise its concerns through administrative rule making avenues.

data had no "material impact" on Odyssey's CON applications. And Odyssey does not argue that inclusion of the missing data would have resulted in approval of its applications. The majority of counties, including the most heavily populated, returned the surveys, and the Department used historical data where it was available in place of data from the counties that did not return the surveys. Odyssey fails to show that the Department's substitution of historical data for the missing data significantly affected calculation of the statewide hospice usage rate for purposes of determining need.[7]

¶37 We hold that Odyssey fails to show that the Department acted in an arbitrary and capricious manner when, in calculating statewide hospice usage, it substituted historical data in place of survey data missing from some nonresponding counties.

¶38 Accordingly, we affirm the superior court's grant of summary judgment to the Department and its denial of Odyssey's petition for review of the HLJ's denial of its CON applications.

PENOYAR, A.C.J., and HOUGHTON, J., concur.

---

[7] Moreover, as the Intervenors note, Evergreen Hospitals performed calculations under WAC 246-310-290(7) to determine unmet hospice need for King County and Snohomish County, with slightly more complete data in step one. Use of this data set resulted in the same conclusion as the Department's calculations for Odyssey's CON applications—that there was no need for additional hospice care agencies in the counties for which Odyssey was applying to build new hospice facilities.