# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ESSES DAMAN FAMILY, LLC, ) | No. 76016-5-I |
| ) | |
| Respondent/Cross Appellant, ) | DIVISION ONE |
| ) | |
| v. ) | |
| ) | |
| POLLUTION CONTROL HEARINGS ) | UNPUBLISHED OPINION |
| BOARD, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| WASHINGTON STATE DEPARTMENT ) | |
| OF NATURAL RESOURCES, ) | |
| ) | |
| Appellant/Cross Respondent, ) | |
| ) | |
| and ) | |
| ) | |
| QUINAULT INDIAN NATION, ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| QUINAULT INDIAN NATION, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| v. ) | |
| ) | |
| POLLUTION CONTROL HEARINGS ) | FILED: August 14, 2017 |
| BOARD and SHERMAN ESSES, ) | |
| ) | |
| Defendants, ) | |
| ) | |

IN THE COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 AUG 14 AM 9: 29
FILED

WASHINGTON STATE DEPARTMENT )
OF NATURAL RESOURCES,                )
                                                           )
    Appellant/Cross Respondent,    )
                                                           )
    and                                       )
                                                           )
ESSES DAMAN FAMILY, LLC,           )
                                                           )
    Respondent/Cross Appellant.    )
_____ )

LEACH, J. — The Esses Daman Family LLC (Daman Family) and the Quinault Indian Nation (Nation) each challenge a Pollution Control Hearings Board (PCHB) decision about logging permits granted by the Washington State Department of Natural Resources (DNR). Because the PCHB misread the Forest Practices Board Manual, we reverse and remand for the PCHB to reconsider the permit challenges. And because Daman Family did not present to the PCHB its only argument on appeal, we dismiss its appeal.

## FACTS

The Forest Practices Act of 1974 (FPA)[1] regulates forest practices in Washington. The legislature enacted the FPA to "foster the commercial timber industry while protecting the environment."[2] To further these objectives, the FPA created the Forest Practices Board (FPB) and directed it to adopt forest practices rules and establish minimum standards for forest practices.[3]

---

[1] Ch. 76.09 RCW.
[2] Dep't of Nat. Res. v. Marr, 54 Wn. App. 589, 593, 774 P.2d 1260 (1989).
[3] RCW 76.09.030, .040(1).

As directed, the FPB adopted forest practice regulations[4] and developed the Forest Practices Board Manual as a supplement to the regulations. The manual is an advisory technical supplement to the forest practices rules.[5] Among other things, the manual provides guidance about locating a river channel migration zone (CMZ). The CMZ must be located to establish an area on either side of a river protected from logging activities, the riparian management zone (RMZ).[6]

The FPB regulations define a CMZ but provide no other guidance about locating a CMZ:

> **"Channel migration zone (CMZ)"** means the area where the active channel of a stream is prone to move and this results in a potential near-term loss of riparian function and associated habitat adjacent to the stream, except as modified by a permanent levee or dike. For this purpose, near-term means the time scale required to grow a mature forest. (See board manual section 2 for descriptions and illustrations of CMZs and delineation guidelines.)[7]

The manual provides guidance by elaborating on this definition. It breaks CMZ analysis down into a series of component parts that can be used collectively to define the boundaries of the CMZ. These components include a

---

[4] Title 222 WAC.

[5] WAC 222-12-090.

[6] "A riparian management zone is a protective buffer of trees required to remain on each side of a fish-bearing stream to protect water quality." Johnson Forestry Contracting, Inc. v. Dep't of Nat. Res., 131 Wn. App. 13, 17 n.1, 126 P.3d 45 (2005) (citing WAC 222-16-010; WAC 222-30-021).

[7] WAC 222-16-010.

river's historical migration area, its avulsion hazard zone, the erosion hazard area, and any disconnected migration area. All components may not be present for a river. This case involves analysis of the disconnected migration area.

DNR administers and enforces the FPA and regulations adopted under the FPA.[8] As part of these activities, DNR evaluates and approves or disapproves applications to harvest timber.[9]

Sherman Esses and Daman Family[10] each own 40 forested acres located about six miles northeast and upriver of Lake Quinault in Jefferson County. The South Shore Road abuts the north boundary of each parcel. The Quinault River lies 600 to 1,000 feet north of the properties.

They jointly submitted applications to log on their adjacent parcels. DNR approved the applications without completing any CMZ or RMZ analysis. The Nation appealed the approvals.[11] The Nation's appeal caused the PCHB to suspend the approvals pending a full evidentiary hearing.

---

[8] RCW 76.09.140(1), .040(1)(c); WAC 222-46-015; WAC 222-16-010.
[9] See RCW 76.09.050(5).
[10] Sherman Esses is not directly participating in the appeal.
[11] The PCHB explained the Nation's interest in the matter:

> The Nation has a federally protected treaty right to take fish from the Upper River Valley, which is within their usual and accustomed fishing area. The River and its salmon runs have economic and cultural significance to the Nation. The Blueback sockeye in particular is a cultural icon for the Nation and is unique to the River.

. . . .

The PCHB held an eight-day evidentiary hearing and conducted a two-hour site visit. At the hearing, the parties introduced testimony from five geologists, four of whom performed CMZ delineations.

DNR, Daman Family, and the Nation presented different CMZ locations. Daman Family located the CMZ north of their properties. The Nation asserted that the CMZ extends significantly into the parcels. DNR changed its position from initial approval and asserted that the South Shore Road acted as barrier to channel migration. Thus, it claimed that the CMZ extends only to the road and the RMZ extends 140 feet beyond the road into the Daman Family parcels.[12]

The PCHB found the CMZ analysis of DNR's expert to be the "most credible" because that expert relied on the longest period of data to locate the

---

The sockeye salmon runs in the River have declined dramatically over the last century. Concern regarding these negative changes prompted the Nation to ask the Bureau of Reclamation [BOR] in 2001 to evaluate the Upper Quinault River sockeye habitat. The resulting BOR Report concluded that a primary reason for this decline is the clearing of mature forests and large woody debris from the historic floodplain of the River, which has caused the River to lose stability and simplify in shape. This change in the River has reduced its ability to create and maintain habitat for salmon, because as the River moves across the floodplain it destroys productive habitat. A primary limiting factor to salmon production in the River is availability of older side and terrace tributary channels that persist for more than 30 years.

(Citations omitted.)

[12] There is no dispute in this case that the RMZ extends 140 feet from the edge of the CMZ. WAC 222-16-010; WAC 222-30-021.

historical migration area and because she used "a conservative approach to the erosion calculation while still being consistent with the Manual." Thus, the PCHB concluded that the Quinault River erosion rate would result in its migration across the north half of each parcel in the next 140 years, the time required to grow a mature forest.[13] But it also found that the South Shore Road is a "permanent dike or levee" and functions as the southern boundary of the CMZ. As a result, the PCHB concluded that the RMZ extends 140 feet south of the road into the parcels. The PCHB reversed the permits and remanded so DNR could grant the permits with additional restrictions consistent with its findings.

Both Daman Family and the Nation sought judicial review of the PCHB's decision. The superior court dismissed the Daman Family appeal because Daman Family had not presented to the PCHB the only issue it raised in its superior court appeal. The court then reversed the PCHB's decision, agreeing with the Nation that the PCHB had misread and misapplied the manual.

Daman Family and DNR appeal.

## STANDARD OF REVIEW

We review decisions of the PCHB under the Administrative Procedure Act (APA).[14] We review its decision "'from the same vantage point as the trial court,

_____

[13] WAC 222-16-010.
[14] Ch. 34.05 RCW; Fort v. Dep't of Ecology, 133 Wn. App. 90, 95, 135 P.3d 515 (2006).

applying [APA] standards directly to the record before the Board.'"[15] We will grant relief under the APA only if the challenged agency decision fails one or more of the tests in RCW 34.05.570(3).

We review alleged errors of law de novo.[16] To decide if substantial evidence supports the PCHB's factual determinations, we ask whether, considering the record as a whole, the evidence is sufficient to persuade a fair-minded person of the matter.[17] We overturn an agency's factual findings only if they are clearly erroneous.[18] We treat unchallenged findings of fact as verities on appeal.[19]

If we decide that substantial evidence supports the PCHB's findings, we then decide if those findings support the PCHB's conclusions of law.[20] The application of law to fact is a question of law that we review de novo.[21] An agency action is arbitrary and capricious when it is "willful and unreasoning and

---

[15] Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd., 173 Wn. App. 310, 325, 293 P.3d 1248 (2013) (alteration in original) (quoting Manke Lumber Co. v. Diehl, 91 Wn. App. 793, 801-02, 959 P.2d 1173 (1998)).

[16] Skagit Hill Recycling, Inc. v. Skagit County, 162 Wn. App. 308, 318, 253 P.3d 1135 (2011).

[17] Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009).

[18] Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 588, 90 P.3d 659 (2004).

[19] Campbell v. Emp't Sec. Dep't, 180 Wn.2d 566, 573, 326 P.3d 713 (2014).

[20] J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007).

[21] Port of Seattle, 151 Wn.2d at 588.

taken without regard to the facts and circumstances."[22] Where room exists for two opinions, an action is not arbitrary and capricious even though the reviewing court believes the agency's decision wrong.[23] The party challenging an agency action has the burden of showing its invalidity.[24]

## ANALYSIS I – DAMAN FAMILY APPEAL

We first consider the Daman Family appeal.

Daman Family asserts that because its CMZ analysis complied with the manual's guidelines, the PCHB had to accept it and approve its application using its CMZ location. But Daman Family did not present this argument to the PCHB. For this reason, the superior court dismissed the Daman Family appeal, deciding that RCW 34.05.554(1) barred it. We agree with the superior court.

RCW 34.05.554(1) states that "[i]ssues not raised before the agency may not be raised on appeal."[25] A mere hint or slight reference to the issue in the record below is not enough to preserve the issue.[26] To the PCHB, Daman Family argued that its expert provided the most accurate CMZ analysis because

---

[22] Dep't of Ecology v. Theodoratus, 135 Wn.2d 582, 598, 957 P.2d 1241 (1998).

[23] Theodoratus, 135 Wn.2d at 598.

[24] RCW 34.05.570(1)(a).

[25] This rule is subject to several exceptions, none of which apply in this case. RCW 34.05.554(1).

[26] Bowers v. Pollution Control Hr'gs Bd., 103 Wn. App. 587, 597, 13 P.3d 1076 (2000) (quoting King County v. Wash. State Boundary Review Bd., 122 Wn.2d 648, 670, 860 P.2d 1024 (1993)).

it complied with the manual.[27]  On appeal to the superior court, Daman Family changed its position.  It argued that even if the PCHB did not find the Daman Family CMZ analysis the most accurate, DNR must approve any forest practices application that complies with the manual and may not impose additional requirements.  Because Daman Family did not make this argument to the PCHB, the trial court correctly declined to consider it.

Daman Family invites us to consider the issue anyway.  They claim that we have "inherent authority" to consider their appeal.  We have inherent authority to consider all issues necessary to reach a proper decision.[28]  But Daman Family has not provided a compelling reason why we should consider its appeal in this case.  The FPB drafted the manual to account for the interests of forested landowners who seek to harvest timber.[29]  And the PCHB relied on DNR's manual compliant analysis to reach its decision.  We decline the Daman Family invitation to consider its appeal.

---

[27] "This Board will need to approach the CMZ issue . . . to determine which analysis is the most accurate in predicting not just where the Quinault River might possibly migrate, but where it is *likely* to migrate in the next 140 years."

[28] Heidgerken v. Dep't of Nat. Res., 99 Wn. App. 380, 387 n.3, 993 P.2d 934 (2000).

[29] RCW 76.09.040(1)(c) (stating that the forest practice rules "shall be adopted and administered so as to give consideration to all purposes and policies set forth in RCW 76.09.010"); RCW 76.09.010(2)(c) (declaring that recognizing "the public and private interest in the profitable growing and harvesting of timber" is a purpose and policy of the forest practices rules).

ANALYSIS II – QUINAULT INDIAN NATION'S CHALLENGE

We next consider the Nation's challenge to the PCHB's conclusion that the South Shore Road is a "permanent dike or levee" as defined by the manual. We agree that the PCHB misinterpreted the manual to reach this decision. Thus, it made an arbitrary and capricious decision. In addition, its record does not contain sufficient evidence to support its finding that the road is a permanent dike or levee.

The Nation and DNR agree that the manual is not law. But they dispute what standard we should use to review the PCHB's interpretation of the manual. DNR claims that the meaning of the manual presents a question of fact and that this court should review the PCHB resolution of the manual interpretation issue for substantial evidence. DNR claims that the principles of statutory construction do not apply to interpretation of the manual. But it cites no authority for this claim or for its apparent position that we do not use the same set of rules to interpret the manual that we typically use to interpret statutes, administrative regulations, and other writings. Rules of interpretation and construction that normally apply to statutes also apply to regulations and other writings.[30] Thus, we apply the error

---

[30] Mader v. Health Care Auth., 149 Wn.2d 458, 472, 70 P.3d 931 (2003) ("We interpret regulations under the rules of statutory construction."); Callan v. Callan, 2 Wn. App. 446, 448-49, 468 P.2d 456 (1970) ("The general rules of construction applicable to statutes, contracts and other writings are used with respect to findings, conclusions and judgment.").

of law de novo standard of review to the PCHB's interpretation of the manual and use principles of statutory interpretation in our review.

The Nation asserts that the PCHB incorrectly concluded that the manual is ambiguous about the meaning of a permanent dike or levee. As a result, it relied on inappropriate evidence to conclude that the South Shore Road is a permanent dike or levee. We agree.

When interpreting a statute, a court first looks to its language.[31] If the language is not ambiguous, the court gives effect to its plain meaning and does not employ any tool of statutory construction.[32] A statute is not ambiguous just because two or more meanings can be conceived; at least two meanings must each be a reasonable interpretation.[33] We apply these rules to the manual.

The Nation and DNR dispute the meaning of the underlined paragraph in this part of the manual, which appears on a single page under one heading:

> Disconnected Migration Area (DMA): The disconnected migration area (DMA) is the portion of the CMZ behind a permanently maintained dike or levee. The CMZ of any stream can be limited to exclude the area behind a permanent dike or levee provided these structures were constructed according to appropriate federal, state, and local requirements. As used here, a permanent dike or levee is a channel limiting structure that is either:
> 1. A continuous structure from valley wall or other geomorphic structure that acts as a historic or ultimate limit to lateral channel

---

[31] State v. Jones, 168 Wn.2d 713, 722, 230 P.3d 576 (2010).
[32] Cerrillo v. Esparza, 158 Wn.2d 194, 201, 142 P.3d 155 (2006).
[33] Agrilink Foods, Inc. v. Dep't of Revenue, 153 Wn.2d 392, 396, 103 P.3d 1226 (2005).

movements to valley wall or other such geomorphic structure and is constructed to a continuous elevation exceeding the 100-year flood stage (1% exceedence flow); or

2. A structure that supports a public right-of-way or conveyance route and receives regular maintenance sufficient to maintain structural integrity (Figure 19).

A dike or levee is not considered a "permanent dike or levee" if the channel limiting structure is perforated by pipes, culverts, or other drainage structures that allow for the passage of any life stage of anadromous fish and the area behind the dike or levee is below the 100-year flood level.

The Washington Department of Fish and Wildlife (WDFW) and the Indian tribes can often provide assistance in evaluating the potential for seasonal fish passage and use of the floodplain, as well as details on dike permitting. Applicants should also contact local, state, federal, and tribal entities to make sure that there are no plans to remove the structure.

(Emphasis added.)

The Nation claims that the underlined text modifies the preceding two numbered sentences and excludes perforated structures from the definition of a permanent dike or levee. DNR claims that the underlined text has no relationship to the preceding two sentences and was intended to allay concerns "that the streams and wetlands behind dikes or levees might not continue to be treated (and buffered) as fish bearing, despite the presence of a dike or levee."

The PCHB found the relationship of the underlined text to the preceding definition ambiguous. It agreed that the structure of the quoted manual text supports the Nation's interpretation. But it decided that interpretation was "problematic because it would eliminate virtually all roads from ever constituting

channel limiting structures because most roads have culverts." It also concluded that the Nation's interpretation (1) would render the second numbered part of the definition of a permanent dike or levee meaningless, (2) was inconsistent with a manual illustration showing a road limiting a CMZ, and (3) was inconsistent with the definition of "dike or levee" in the manual glossary.[34]

As a result, the PCHB found reasonable and accepted the testimony of a DNR employee and manual drafting committee member about the underlined language, its source, and his interpretation.

The PCHB should not have relied on this testimony because the meaning of the underlined text is clear on its face. The manual first explains what a permanent dike or levee is. It then immediately explains what a permanent dike or levee is not. We agree with the superior court's conclusion that this is the only reasonable interpretation. The text following alternative two unambiguously establishes an exception to what may be considered a permanent dike or levee. No other reasonable interpretation is apparent from the text.

The manual glossary definition of "dike or levee (constructed)" does not create an ambiguity:

> **dike or levee (constructed):** A continuous structure from valley wall to valley wall or other geomorphic feature that acts as an

---

[34] The PCHB assumed that the road in the illustration would have culverts because "[t]here is no reason to think that the road in the Figure, like most roads, would not have culverts."

historic or ultimate limit to lateral channel movements and is constructed to a continuous elevation exceeding the 100-year flood stage (1% exceedence flow); or a structure that supports a public right-of-way or conveyance route and receives regular maintenance sufficient to maintain structural integrity.

The PCHB noted that the glossary definition for "dike or levee (constructed)" is the same as the description of a "permanent dike or levee" as it relates to disconnected migration areas but does not include the underlined text about culverts or the 100-year flood level. Relying on this comparison, the PCHB concluded that the underlined text did not modify the preceding definition and limit it. But the glossary definition is not inconsistent with our reading of the section on disconnected migration areas. First, the two sections define different terms: "dike or levee (constructed)" and "permanent dike or levee." Where different terms are used in the same document, we presume that those terms are meant to have different meanings.[35] Applying that rule here, we presume that the manual's drafters intended that "permanent dike or levee" as defined in the context of disconnected migration areas mean something different than the definition of "dike or levee (constructed)" found in the glossary. Moreover, the disconnected migration area section defines permanent dike or levee "as used here." By contrast, the glossary definition does not include any guidance for how that definition should be used. The glossary definition does not create any

---

[35] Durland v. San Juan County, 182 Wn.2d 55, 79, 340 P.3d 191 (2014).

ambiguity about the meaning of permanent dike or levee in the context of disconnected migration areas.

DNR asserts that its interpretation—that the underlined text does not create an exception—is entitled to "great weight." A court gives an agency's special interpretation of a statute great weight when the statute is within the agency's special expertise, provided that the statute is ambiguous.[36] "Absent ambiguity, however, we do not defer to an agency's expertise in construing a statute."[37] Here, although DNR may have expertise in the area of forest practices, a court does not owe its interpretation any deference because the challenged language is unambiguous. Further, "[i]f an agency is asserting that its interpretation of an ambiguous statute is entitled to great weight it is incumbent on that agency to show that it has adopted and applied such interpretation as a matter of agency policy."[38] DNR has not shown that it has adopted its proffered interpretation in any other case. We do not give DNR's interpretation any deference.[39]

---

[36] Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 77, 11 P.3d 726 (2000); Theodoratus, 135 Wn.2d at 589.

[37] Friends of the Columbia Gorge, Inc. v. Forest Practices Appeals Bd., 129 Wn. App. 35, 47, 118 P.3d 354 (2005).

[38] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 815, 828 P.2d 549 (1992).

[39] Even if we were to give great weight to DNR's interpretation, we are not bound by an agency's interpretation of the law. Bowers, 103 Wn. App. at 596.

The PCHB's other reasons for its interpretation of the underlined language rely on information outside the four corners of the manual. Given that the challenged section of the manual is not ambiguous, the PCHB should not have considered this information to determine its meaning.

Based on a plain language reading of the manual, the underlined language limits the definition of a permanent dike or levee. The language of the manual is clear and susceptible to only one reasonable interpretation. The PCHB misapplied the law when it found an ambiguity and relied on extrinsic evidence to interpret the manual. For these reasons, the PCHB's order is arbitrary and capricious.

The PCHB also erred when it concluded that the South Shore Road meets the definition of a permanent dike or levee. Specifically, the PCHB incorrectly found that the road is "[a] structure that supports a public right-of-way or conveyance route and receives regular maintenance sufficient to maintain structural integrity," as described in alternative two.

The PCHB found that the road received regular maintenance from Jefferson County because it is a popular loop road and provides access to federal lands, including the Olympic National Park. The PCHB noted that although well maintained in its current condition, the road would not hold the river back if the river approaches. The PCHB stated, however, that

based on the history of efforts to protect the road from erosion and the reliance of the residents and the local, state, and the federal governments on the South Shore Road, it is reasonable to conclude that Jefferson County will take similar action in the future to protect the South Shore Road from the River in the vicinity of the parcels.

The PCHB erred when it found that the conditions of alternative two were met because the road was "well maintained" and would be armored in the future. The road does not satisfy alternative two simply because the county maintains it well in its current condition. A channel limiting structure that is not structurally capable of holding back the river does not receive maintenance "sufficient to maintain structural integrity." Therefore, it is not a permanent dike or levee under alternative two.

Further, substantial evidence does not support the PCHB's finding that the county would armor the road in the future. It based this conclusion on the fact that when the river has approached other sections of the road in the past, Jefferson County has armored those sections against the river. The PCHB's conclusion that armoring would take place in the vicinity of the Daman Family parcels is speculative.

For these reasons, the PCHB's conclusion that the South Shore Road is a permanent dike or levee is wrong.

No. 76016-5-I / 18

CONCLUSION

We affirm in part and reverse in part. We affirm dismissal of the Daman Family appeal because it based it on an argument raised for the first time on appeal to the superior court. We reverse the PCHB's CMZ delineation because the PCHB based its decision on a misinterpretation of technical guidance developed by the FPB. We remand this case to the PCHB to determine the southern boundary of the CMZ without consideration of the South Shore Road as a permanent dike or levee.

_Leach, J._

WE CONCUR: